26-30174

# In the United States Court of Appeals for the Fifth Circuit

*O.E., by and through his parents, C.E. and C.E.*,

Plaintiff-Appellant,

v.

*Advocates for Arts-Based Education Corporation,*
*d/b/a The Willow School*,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:25-cv-1054

---

# BRIEF OF PLAINTIFF-APPELLANT

Christopher F. Edmunds,
LSBA # 37670
Chris Edmunds Law Office
740 Dante St.,
New Orleans, LA 70118

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 5th Cir. R. 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiff–Appellant:
   O.E., by and through his parents, Christopher Edmunds and Cristina Edmunds

2. Defendant-Appellee:
   Advocates for Arts-Based Education Corporation,
   d/b/a The Willow School

3. Counsel for Plaintiff-Appellant:
   Christopher Edmunds
   *Chris Edmunds Law Office*

4. Counsel for Defendant-Appellee:
   Melissa M. Lessell, Raymond Chandler Lewis, Casey Bordelon, Wendling
   *Deutsch Kerrigan LLP*

/s/ *Chris Edmunds*
Chris Edmunds, Counsel for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant, O.E., has no opposition to oral argument. That said, oral argument is not necessary, because this case presents cut-and-dried errors by the district court. For example, the district court held that "*enrollment*—not residence—triggers IDEA obligations." ROA.1035. But just recently, this Court held, in a published opinion, that a child's "residence"—not enrollment—"determine[s] whether" a local educational agency (LEA) "owe[s]" that child a free appropriate public education. *Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630, 640 (5th Cir. 2026). Similarly, the district court concluded that O.E. must prove "intentional discrimination" to state a claim under Title II of the Americans with Disabilities Act. But the Supreme Court has made clear that public school students can prove a "statutory violation and obtain injunctive relief under the ADA … *without proving intent to discriminate*." *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344 (2025). Accordingly, oral argument is not necessary—this case is straightforward.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** .......... 2
**STATEMENT REGARDING ORAL ARGUMENT** .......... 3
**TABLE OF CONTENTS** .......... 4
**TABLE OF AUTHORITIES** .......... 7
**JURISDICTIONAL STATEMENT** .......... 12
**STATEMENT OF THE ISSUES** .......... 12
**STATEMENT OF THE CASE** .......... 14
**SUMMARY OF THE ARGUMENT** .......... 19
**ARGUMENT** .......... 22

**I. O.E. states a claim under the IDEA, because he is a "resident" of Willow's district.** .......... 23

**A. Under *Herbert*, an LEA's obligations are triggered by a student's "residence" in the district, not enrollment.** .......... 24

**B. Charter schools cannot "pass the buck" to the school district that authorized the charter school.** .......... 26

**C. If accepted, the district court's ruling would create a "Catch-22," in which intellectually disabled students can never challenge Willow's refusal to admit them.** .......... 27

**D. The district court's "charter dominant" exception has no basis in the text and leads to absurd results.** .......... 29

**E. Louisiana law premises IDEA obligations on "residence," not enrollment.** .......... 31

1. ***Louisiana law looks to "residence" in the district.*** .......... 32
2. ***The district court relied on a Louisiana regulation that, read literally, says Willow has IDEA obligations only to students residing inside the school building.*** .......... 32

**F. New Orleans' school system must operate within the IDEA's framework—not the other way around.** .......... 34

**G. Federal law is supreme.** .......... 36

**II. Under Title II of the ADA, O.E. plausibly alleges that he was "excluded" from eligibility "by reason of" his disability, and no "intentional discrimination" is required to state a claim.......................37**

**A. Under the plain text, O.E. was "excluded" from eligibility to attend Willow "by reason of" his disability.** ............................................................. 38

**B. The district court erred by concluding that Title II requires a showing of "intentional discrimination."** ..................................................................... 40

1. ***Under longstanding precedent, "intent" is not required to prove a violation and win an injunction.*** ...........................................................................40

2. ***The plain text requires no showing of intent.*** ..................................................42

3. ***Prohibiting only "intentional" discrimination would lead to absurd results.*** ..................................................................................................................44

**C. Willow denied O.E. a reasonable modification.** ........................................... 45

1. ***Waiving the assessment for O.E. is a "generally reasonable" modification.*** ...................................................................................................46

2. ***Willow did not raise the "fundamental alteration" defense; instead, the district court improperly invoked the defense on Willow's behalf.*** ............48

3. ***The district court misallocated the burden of persuasion.*** ..........................50

4. ***Even if the "fundamental alteration" defense had been properly raised, it would fail as a matter of law, because Willow is an LEA.*** ........................52

5. ***The district court identified the wrong "service, program, or activity."***..55

6. ***Whether the assessment "measures intelligence," as opposed to "achievement," is legally irrelevant.*** ..................................................................56

7. ***At a minimum, O.E. is entitled to discovery on the "fundamental alteration" issue.*** ................................................................................................57

**D. Willow "consciously" designed its testing policy to exclude students with intellectual disabilities.** ........................................................................ 57

1. ***The district court failed to apply the "mixed motive" framework.*** .............58

2. ***The district court admitted that it's plausible that Willow uses the test, "at least in part," to exclude students with intellectual disabilities.*** .......59

**E. O.E. plausibly alleges that the policy has a disparate impact on students with intellectual disabilities.** ........................................................... 60

1. ***The district court erred by sua sponte raising this issue.*** .............................61

2. ***The text prohibits disparate-impact discrimination.*** ....................................63

3. ***The district court's statutory analysis is flawed and would lead to absurd results.*** ..................................................................................................66

4. ***Even assuming there were any ambiguity in Title II, such ambiguity "must be resolved in plaintiff's favor" on a Rule 12 motion.*** .........................68

**F. O.E. plausibly alleges "actual notice" of a violation, which would entitle him to *damages*, in addition to equitable relief.** ............................ 69

**III. The district court erred by denying the motion for a preliminary injunction, as it employed incorrect legal standards and made clearly erroneous findings of fact.** .......................................................................... **72**

**A. O.E. is substantially likely to prevail on the merits.** ................................. 72

**B. The other factors weigh heavily in favor of a preliminary injunction.** 76

**CONCLUSION** .......................................................................................... **78**

**CERTIFICATE OF COMPLIANCE** ........................................................... **79**

**CERTIFICATE OF SERVICE** ................................................................... **80**

# TABLE OF AUTHORITIES

## Cases

*A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356 (4th Cir. 2008) ....................63
*A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025) ....................12, 13, 19, 22, 24, 40, 54, 69
*A.Z. v. Mahwah Twp. Bd. of Educ.*, No. 04-4003, 2006 WL 827791 (D.N.J. Mar. 30, 2006) ....................31
*Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023) ....................42
*Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004) ....................43, 61, 63
*ACLU of Indiana v. Individual Members of the Indiana State Bd. of L. Examiners*, No. 1:09-CV-842-TWP-MJD, 2011 WL 4387470 (S.D. Ind. Sept. 20, 2011) ....................65
*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ....................59
*Alexander v. Choate*, 469 U.S. 287 (1985) ....................44, 56
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................58
*Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261 (5th Cir. 1997) ....................68
*Bahl v. Cty. of Ramsey*, 695 F.3d 778 (8th Cir. 2012) ....................55
*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ....................44
*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982) ....................52
*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005) ....................45
*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) ....................34, 56
*Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016) ....................63
*Bragdon v. Abbott*, 524 U.S. 624 (1998) ....................66
*Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327 (1980) ....................77
*Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917 (10th Cir. 2012) ....................63
*City of New York v. F.C.C.*, 486 U.S. 57 (1988) ....................37
*Conestoga Tr. v. Columbus Life Ins. Co.*, 759 F. App'x 227 (5th Cir. 2019) ....................50
*D.A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450 (5th Cir. 2010) ....................37

*D.C. v. Abramson*, 493 F. Supp. 2d 80 (D.D.C. 2007)............................35
*Day v. McDonough*, 547 U.S. 198 (2006) ..........................................50, 62
*Dean v. United States*, 556 U.S. 568 (2009)...........................................44
*DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102 (8th Cir. 1997)..................................................................................63
*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981)......................................................................................77, 78
*Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567 (5th Cir. 2002)..........70
*Deutsch v. Annis Enters., Inc.*, 882 F.3d 169 (5th Cir. 2018) .................35
*Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289 (E.D.N.Y. 2009) ..........................................................................................................57
*Doe v. Jud. Nominating Comm'n for Fifteenth Jud. Cir. of Fla.*, 906 F. Supp. 1534 (S.D. Fla. 1995) ..............................................................65
*E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085 (5th Cir. 1987) ..........................................................................................76
*Eagle Found., Inc. v. Dole*, 813 F.2d 798 (7th Cir. 1987)........................29
*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) .......................24, 25
*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc) 41, 42, 45, 46, 51, 61, 65, 66
*Garrett v. Thaler*, 560 F. App'x 375 (5th Cir. 2014) .............................70
*H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172 (5th Cir. 1988) ....................................................................................22, 73
*Hall v. Fla.*, 572 U.S. 701 (2014) ..........................................................39
*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ...................................63
*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)........................63
*Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630 (5th Cir. 2026) .12, 19, 24, 25, 32, 56
*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017).....................................57
*Honig v. Doe*, 484 U.S. 305, 324 (1988) ......................... 20, 23, 26, 52, 53
*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) ......................43
*Idea Pub. Charter Sch. v. Belton*, No. 05-467, 2006 WL 667072 (D.D.C. Mar. 15, 2006)........................................................................................26
*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ...................43
*James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764 (6th Cir. 2000)...................................................................................25, 31
*Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997)..............................................................................20, 46, 47, 51
*Jones v. Texas Dep't of Crim. Just.*, 880 F.3d 756 (5th Cir. 2018)..........72

*L.T. v. N. Penn Sch. Dist.*, 342 F. Supp. 3d 610 (E.D. Pa. 2018) ......25, 36
*Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510 (5th Cir. 2024) .38
*Lee v. United States*, 765 F.3d 521 (5th Cir. 2014)................................48
*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95 (2024)..........65
Lorillard v. Pons, 434 U.S. 575 (1978).................................................65
*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180 (2021) ..........................................................................................29
*Malacara v. Garber*, 353 F.3d 393 (5th Cir. 2003) ................................49
*McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850 (5th Cir. 1993)..........................................................................................53
*Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661 (7th Cir. 1996) ..............43
*Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565 (5th Cir. 2018)........................................................40, 63, 69, 71
*Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057 (D.N.J. 2011).................................................................................30, 34
*Morris v. Homco Int'l, Inc.*, 853 F.2d 337 (5th Cir. 1988)................20, 50
*Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995) ...............69
*Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729 (9th Cir. 2021)....63
*Phillips next friend of J.H. v. Prator*, No. 20-30110, 2021 WL 3376524 (5th Cir. Aug. 3, 2021) ..................................................................71
*Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013 (5th Cir. 2022)............................................................. 14, 21, 57, 58, 59, 60
*R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745 (E.D. Pa. 2010).27, 37
*Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009)...................................39
*Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678 (5th Cir. 1996).....................49
*S-1 v. Turlington*, 635 F.2d 342 (5th Cir. 1981) ...................................77
*Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008) .....63
*Smith v. EMC Corp.*, 393 F.3d 590 (5th Cir. 2004) ...............................72
*Smith v. Harris Cnty., Texas*, 956 F.3d 311 (5th Cir. 2020)...................70
*Sosa v. Mass. Dep't of Correction*, 80 F.4th 15 (1st Cir. 2023) .........61, 63
*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ...............................................................60
*Sugar Busters LLC v. Brennan*, 177 F.3d 258 (5th Cir. 1999) ..............48
*T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407 (5th Cir. 2021)......40, 63
*Taylor v. City of Shreveport*, 798 F.3d 276 (5th Cir. 2015).....................71
*Tcherepnin v. Knight*, 389 U.S. 332 (1967)...........................................69
*Tennessee v. Lane*, 541 U.S. 509 (2004).......................... 13, 41, 42, 44, 46

*Timothy W. v. Rochester, N.H., Sch. Dist.*, 875 F.2d 954 (1st Cir. 1989) ....................23
*U.S. v. San Francisco*, 310 U.S. 16 (1940) ....................77
*Union Planters Bank v. Gavel*, No. 02-1224, 2002 WL 975675 (E.D. La. May 9, 2002)....................78
United States v. Bd. of Comm'rs of Sheffield, Ala., 435 U.S. 110 (1978) ....................65
*United States v. Leahy*, 152 F.4th 1356 (11th Cir. 2025) ....................44
*United States v. Lewis*, No. 08-cr-404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)....................47
*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ....................49, 62
*Vardeman v. City of Houston*, 55 F.4th 1045 (5th Cir. 2022)....................69
*Whitman v. Am. Trucking Associations*, 531 U.S. 457 (2001)....................30
*Windham v. Harris Cnty., Texas*, 875 F.3d 229 (5th Cir. 2017)....................45, 68
*Wink v. Rowan Drilling Co.*, 611 F.2d 98 (5th Cir. 1980) ....................20, 50, 51
*Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006)....................63

**Statutes**

20 U.S.C. § 1400....................23
20 U.S.C. § 1401....................24, 26
20 U.S.C. § 1415....................24
20 U.S.C. § 1415....................24
42 U.S.C § 12131....................37
42 U.S.C. § 12101....................37
42 U.S.C. § 12112....................67
42 U.S.C. § 12132....................13, 21, 23, 38, 42, 43, 44, 55, 72
42 U.S.C. § 12134....................37, 64
42 U.S.C. § 12182....................53, 67
H.R. REP. 101-485 (II)....................68
La. R.S. § 17:1941 ....................32
La. R.S. § 17:1942 ....................32
La. R.S. § 17:3996 ....................27
Pub. L. No. 110-325, 122 Stat. 3553 (2008) ....................65

## Regulations

28 C.F.R. § 35.130 ........................................................ 51, 64, 65, 67
28 C.F.R. § 41.51 ............................................................... 64, 66
28 La. Admin. Code Pt XLIII,230 ..................................................... 32, 33
34 C.F.R. §300.209 ..................................................................... 26

## Other Authorities

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ..................................................................... 33
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ............................................. 38
Joseph Heller, *Catch-22*, 761–62 (1961) ........................................... 27

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). This Court has jurisdiction under 28 U.S.C. §§ 1291, 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Under the Individuals with Disabilities Education Act, a child's "residence"—not "enrollment"—"determine[s] whether" a local educational agency "owe[s]" that child a free appropriate public education. *Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630, 640 (5th Cir. 2026). But the district court held that "*enrollment*—not residence—triggers IDEA obligations." ROA.1035. ***Did the district court err by holding that "enrollment—not residence—triggers" the IDEA?***

2. Under Title II of the Americans with Disabilities Act, plaintiffs can prove a "statutory violation and obtain injunctive relief … without proving intent to discriminate." *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344 (2025). But the district court concluded that a Title II plaintiff must prove "intentional discrimination" to state a claim. ***Did the district court err by requiring a showing of "intent" to state a claim under Title II?***

3. A public entity must make "reasonable modifications" of its policies to access its programs, unless the modification would "fundamentally alter the nature of" that particular program. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). The "service, program, or activity" that O.E. was excluded from is Willow's *educational* program. 42 U.S.C. § 12132. But the district court concluded that the "program" at issue was Willow's *admissions* process—a program O.E. accessed just fine. ***Did the district court err by identifying the wrong "service, program, or activity"?***

4. The district court held that it would "fundamentally alter" a school to admit students who do not demonstrate a "mastery of academic content." ROA.1048. But the school is subject to the IDEA, requiring it to educate "all students," including those with "severely limit[ed] … cognitive functioning." *A.J.T.*, 605 U.S. at 338. ***Did the district court err by concluding that it would "fundamentally alter the nature of" a school to admit intellectually disabled students, when that school is statutorily required to educate such students?***

5. Under Title II, if a complaint plausibly alleges that a decision was motivated "in part" by a discriminatory goal, it states a claim for "conscious discrimination," even if discrimination is not the "most likely"

explanation. *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034–35 (5th Cir. 2022). The district court concluded that a public school "may have adopted [a preadmissions test], *at least in part*, to exclude students with intellectual disabilities," but nonetheless dismissed the conscious-discrimination theory based on its belief that there are "more likely explanations." ROA.1046. ***Did the district court err by failing to apply Title II's "mixed motive" framework?***

6. The district court denied a motion for a preliminary injunction, even though a public school's top officials admitted that it educates **zero** students with intellectual disabilities. ROA.1275–77. The school has around 2,300 students, and the statewide average of public-school students with intellectual disability is 11%. ROA.1291; ROA.1521. All else equal, it should have roughly 250 intellectually disabled students. ***Did the district court err in denying a preliminary injunction to enjoin a plainly discriminatory policy resulting in zero intellectual disabled students?***

## STATEMENT OF THE CASE

O.E. is a 10-year-old boy born with a rare genetic condition, called 21q Partial Deletion Syndrome, which causes "profound" disabilities.

ROA.12–16. He cannot walk, eat by mouth, speak, or do numerous other tasks that most people take for granted. ROA.83–118. Because he is missing a significant amount of brain matter, he has the "cognitive function" of a "1- or 2-year-old child." ROA.14; ROA.83–89; ROA.124–49.

The Willow School is a public charter school in New Orleans, operated by a corporation called Advocates for Arts-Based Education Corporation. It used to be called Lusher, named after "Robert Mills Lusher," a "Confederate leader during the Civil War." Marie Fazio, *With a new name and new leadership The Willow School —formerly Lusher — looks ahead*, The Times Picayune (Sep. 12, 2022).[1] The school changed its name and appointed a new CEO, Nicolette London, who promised "to pursue diversity, equity and inclusion." *Id.*

There are over 66 public schools in New Orleans, but the Orleans Parish School Board operates only one of them. ROA.17 at ¶39.[2] The rest are independent charter schools. Nearly all are "open enrollment" schools, open to any school-age children who reside in Orleans Parish.

---

[1] Available at https://www.nola.com/news/education/with-a-new-name-and-new-leadership-the-willow-school-formerlylusher-%20looks-ahead/article_f3148e02-2f94-11ed-912f-97edfcc066fb.html

[2] *See* NOLA Public Schools, *Governance Chart*, https://nolapublicschools.com/images/Every_Day_Counts/FINAL_Governance_Chart_2025_2026_July_2025.pdf?type=file

ROA.49. Willow was chartered as a "selective admissions" school, allowing it to "establish[] requirements related to admissions." ROA.172–76 at ¶ 3.1.2; ROA.194–95. But Willow agreed that any such requirements must "comply with" the Americans with Disabilities Act and the Individuals with Disabilities Education Act. ROA.171 at ¶ 2.5.

Willow is not a "magnet" school. Magnet schools are "operated by a local school board." *Zelman v. Simmons-Harris*, 536 U.S. 639, 647 (2002). But Willow is an "independent public school" with "autonomy" from the local school board and "independent operational decisionmaking authority." La. R.S. §§ 17:3973(1), (2)(a).

O.E.'s parents wanted to send their son to Willow because it is close to their home. ROA.16. But Willow requires that prospective applicants score in the 50th percentile or above on a standardized test, called the IOWA assessment, which tests "reading" and "math." ROA.21–25; ROA.319. Children who attain the minimum score on the IOWA assessment are placed into a "lottery" for seats. ROA.21. Children who do not are excluded from this lottery. ROA.21. O.E.'s parents requested a waiver of the assessment. ROA.23. They sent medical documentation of his disability and letters from multiple providers, explaining that,

because of his disability, O.E. "would score at or near the bottom percentile of all test takers." ROA.24; ROA.127–31.

After months of stonewalling, Willow finally responded but refused to waive the assessment. ROA.23–24. To avoid any "ripeness" or standing issues, O.E.'s parents made the "futile gesture" of subjecting their son to a 6-hour multiple-choice assessment to test his skills in reading and math. ROA.25. Predictably, he failed. His results were eighth percentile in reading and second percentile in math, making him categorically ineligible to "continu[e] in the admissions process." ROA.25; ROA.319.

After exhausting his administrative remedies, ROA.25–26, O.E. filed suit. ROA.12–32. He moved for a preliminary injunction, and Willow moved to dismiss. ROA.363–89; ROA.530–654. The district court held oral argument on the motion to dismiss, which lasted 2.5 hours. ROA.894; ROA.1096–1191. About two weeks later, it held an evidentiary hearing on the preliminary-injunction motion. ROA.1192–1429.

The hearing revealed a smoking-gun admission: out of Willow's nearly 2,300 students, **zero** have intellectual disabilities. ROA.1221; ROA.1275–77 ("Willow does not have a student with an IEP as a student

with an intellectual disability."). Statewide, students with intellectual disabilities comprise 11% of the public-school population. ROA.1291; ROA.1521. All else equal, Willow should have roughly 250 students with intellectual disabilities, but it has "zero." ROA.1292; ROA.1334.

Willow's officials could not explain what—if not the IOWA assessment—accounts for this discrepancy. ROA.1423 (admissions director, Maggie Schodell, testifying that she "cannot explain why there are zero students with intellectual disabilities"). Nor could they identify which of Willow's other eligibility criteria "uniquely disadvantage" students with intellectual disabilities. ROA.1384–86; ROA.1418–22. The special-education director, Jeffrey Chenier, speculated that parents of such children might be "filter[ing] themselves out" and not bothering to apply, because they "know that they cannot attain the minimum score." ROA.1351. No Willow official could explain how a profoundly disabled child, who cannot "recite the alphabet" or add "2 plus 2," can ever pass a fourth-grade reading/math test. ROA.1208–09; ROA.1285.

In a 54-page opinion, the district court dismissed the complaint in its entirety and denied the motion for a preliminary injunction. ROA.1020–73. O.E. timely filed a notice of appeal. ROA.1092.

## SUMMARY OF THE ARGUMENT

The district court improperly dismissed the complaint because it applied incorrect legal standards under Title II of the ADA and the IDEA.

Under the IDEA, this Court recently held that a child's "residence" is what "determine[s] whether" a local educational agency "owe[s]" a free appropriate public education to a child. *Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630, 640 (5th Cir. 2026). But the district court's order directly contradicts *Herbert*, concluding that "*enrollment*—not residence—triggers IDEA obligations." ROA.1035.

To reach this result, the district court invented a "charter dominant" exception to the IDEA. This judicial invention applies only to schools "located in Orleans Parish"—nowhere else. It also creates a Catch 22: O.E. cannot challenge Willow's use of a preadmission "achievement test" unless he is enrolled, but the only way to become enrolled is to *pass* the achievement test, which he cannot do because of his intellectual disability.

The district court also erred in applying Title II. Public school students can prove a "statutory violation and obtain injunctive relief … without proving intent to discriminate." *A.J.T.*, 605 U.S. at 344. But the

district court reached the opposite conclusion, holding that Title II requires a showing of "intentional discrimination" to state a claim. ROA.1042.

The district court also erred in its application of the "reasonable modification" theory. It held that O.E. failed to state a claim because waiving the assessment for O.E. would "fundamentally alter" the nature of Willow's program. But this is an affirmative defense that must be pleaded and proven by the defendant. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997). Willow never raised it; the district court asserted the defense for Willow *sua sponte*, which constitutes reversible error. *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342–43 (5th Cir. 1988). What's more, the district court "misallocated the burden" of persuasion, requiring that O.E. *disprove* the affirmative defense in his complaint. *Wink v. Rowan Drilling Co.*, 611 F.2d 98, 100 (5th Cir. 1980).

On the merits, the district court's *sua sponte* analysis is flawed. Willow is an LEA, which means it must accept "all students, regardless of the severity of their disabilities." *Honig v. Doe*, 484 U.S. 305, 324 (1988). Accepting intellectually disabled students cannot sensibly work

a "fundamental alteration" to the nature of Willow's educational program within the meaning of Title II, because Willow is *statutorily required* to educate such students under the IDEA. To avoid this conclusion, the court identified the wrong "service, program, or activity." 42 U.S.C. § 12132. It concluded that waiving the assessment would "fundamentally alter" Willow's program because it "constitutes the largest component of the eligibility matrix." ROA.1052. But the relevant "program" at issue is Willow's *educational* program (i.e., attending the school)—not the *process to gain admission* to that program. Once admitted to Willow, a student's score on the test has no relevance.

The district court's "conscious discrimination" analysis fares no better, as it failed to apply the "mixed motive" framework. *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034–35 (5th Cir. 2022). The court concluded that "Willow may have adopted the Iowa Assessment, *at least in part*, to exclude students with intellectual disabilities," but nonetheless dismissed the conscious-discrimination theory based on its belief that there are "more likely explanations" for the decision. ROA.1046. But a discriminatory motive "need not be the most likely to be plausible." *Pickett*, 37 F.4th at 1034. If it's plausible that

Willow designed the test "at least in part" to exclude intellectually disabled students, then O.E. states a claim under Title II. *Id.*

Finally, the district court erred in denying O.E.'s motion for a preliminary injunction, as it relied on the same incorrect legal standards it did in dismissing the complaint. *H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 180–81 (5th Cir. 1988). The district court also made "clearly erroneous" factual findings. For example, even though Willow admitted that it has "zero" students with intellectual disabilities, ROA.1274–77, the district court euphemized this figure as "fewer than five percent," ROA.1070. This finding is clearly erroneous, because it creates the false impression that Willow could have as many as 115 students with intellectual disabilities, when the true number is zero.

## ARGUMENT

"Multiple federal laws afford 'diverse' (and occasionally overlapping) protections for children with disabilities in public schools." *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 339 (2025). Title II of the ADA is broadly applicable and prohibits public entities from "exclud[ing]" children with disabilities. 42 U.S.C. § 12132. The IDEA governs only public schools and provides that "all children" are

entitled to a "free appropriate public education." 20 U.S.C. §§ 1400(d), 1413. This Court reviews the dismissal of a complaint de novo. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

## I. O.E. states a claim under the IDEA, because he is a "resident" of Willow's district.

Initially enacted in 1975 as the Education for All Handicapped Children Act, Congress revamped the statute in 1990 and renamed it the Individuals with Disabilities Education Act. Pub. L. No. 101-476, 104 Stat. 1103. Congress passed the law "after finding that school systems across the country had excluded one out of every eight disabled children from classes." *Honig v. Doe*, 484 U.S. 305, 324 (1988). It "attacked such exclusionary practices in a variety of ways." *Id.* Specifically, it required States to "educate *all* disabled children, regardless of the severity of their disabilities." *Id.* (emphasis in original). The IDEA allocates responsibility at the local level, through "local educational agencies," or "LEAs." 20 U.S.C. §§ 1415; 1401(19).

The IDEA "encompasses a universal right," requiring LEAs to educate "all handicapped children, unconditionally and without exception." *Timothy W. v. Rochester, N.H., Sch. Dist.*, 875 F.2d 954, 966 (1st Cir. 1989). If a student cannot succeed in an LEA's general

curriculum, the LEA must "provide special education and related services, including instruction tailored to meet a child's unique needs." *A.J.T.*, 605 U.S. at 340. The statute expressly applies to students "applying for initial admission to a public school," 20 U.S.C. § 1415(j), and it "affords parents substantial procedural safeguards, including the right to challenge a school district's eligibility determination," *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009).

### A. Under *Herbert*, an LEA's obligations are triggered by a student's "residence" in the district, not enrollment.

The district court concluded that "*enrollment*—not residence—triggers IDEA obligations." ROA. 1035. But this Court recently held, in a published opinion, that an LEA's obligations are triggered by a student's "residence" in the district, not enrollment. *Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630, 640 (5th Cir. 2026). The child in *Herbert* was initially enrolled into the St. James Parish school system, because the parents misrepresented their parish of residence. *Id.* at 634–35. The lower court concluded that, despite the child's enrollment, the LEA "was not responsible for providing [the child] a FAPE," because he was not a resident of the parish. *Id.* at 640.

On appeal, this Court affirmed. It held that, "under Louisiana law," the family's "**residence** determined whether the School Board owed [the child] a FAPE." *Id.* It did not matter that the child was initially "enrolled," because he was enrolled "in a school district where he did not reside." *Id.* at 642. Other courts are in accord. *James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000) (holding that IDEA is triggered by "residence in the district, not from enrollment"); *L.T. v. N. Penn Sch. Dist.*, 342 F. Supp. 3d 610, 619 (E.D. Pa. 2018) ("[R]equiring enrollment as a prerequisite to obtaining an IEP contravenes the 'remedial nature' of the IDEA").

Accordingly, the district court's conclusion—that "*enrollment*—not residence—triggers IDEA obligations," ROA. 1035—is precisely backwards. It is undisputed that O.E. is a resident of Orleans Parish—which is the geographic area Willow has agreed to serve. ROA.20–21 at ¶¶ 74–80. As a result, Willow plainly owes IDEA obligations to O.E. *See Herbert*, 177 F.4th at 640.

The district court's approach is also "irrational." *See Forest Grove Sch. Dist.*, 557 U.S. at 245. It would "provide a remedy" when an LEA "offers a child inadequate special-education services," but "immuniz[e]"

the LEA "in the more egregious situation in which [it] unreasonably denies a child access to such services altogether." *Id.* Allowing a public elementary school to filter out students with intellectual disabilities is precisely the type of "exclusionary" system the IDEA was designed to prevent. *Honig*, 484 U.S. at 324.

### B. Charter schools cannot "pass the buck" to the school district that authorized the charter school.

The IDEA specifically provides that "charter schools" must follow the same rules as traditional public schools. It defines the term "elementary school" as including a "charter school." 20 U.S.C. § 1401(6). And there is no dispute that Willow established itself as its own LEA. ROA.17 at ¶ 46; ROA.194 at ¶ 4(b).

As its own LEA, Willow is "responsible for ensuring that the requirements of [the IDEA] are met." 34 C.F.R. §300.209(c). Nonetheless, Willow invokes its status as a "charter" school to skirt liability, insisting that the OPSB is the "only" entity that has IDEA obligations to O.E. ROA.426. But a charter school that establishes itself as an LEA "stands on its own under the IDEA." *Idea Pub. Charter Sch. v. Belton*, No. 05-467, 2006 WL 667072, at *5 (D.D.C. Mar. 15, 2006).

In other words, because Willow established itself as its own LEA, it cannot "pass[] the buck" to the OPSB. *R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 761 (E.D. Pa. 2010) (holding that, as an LEA, charter school was "bound by all the obligations of IDEA").

State law confirms this. La. R.S. § 17:3996(C)(1) (requiring charter schools to "comply with state and federal laws and regulations otherwise applicable to public schools with respect to civil rights and individuals with disabilities"). So does Willow's chartering agreement with the OPSB. ROA.171 at 13, § 2.5.1 (agreeing to "comply with all applicable requirements of federal and state law and regulations concerning the education of students with disabilities"). In fact, Willow even agreed to "indemnify OPSB" for any liability arising out of its own "legal requirements regarding students with disabilities." *Id.* at § 2.5.2.3.

### C. If accepted, the district court's ruling would create a "Catch-22," in which intellectually disabled students can never challenge Willow's refusal to admit them.

In the district court, O.E. argued that Willow's proposed "enrollment" rule would create a Catch-22: "an intellectually disabled student cannot challenge the use of the IOWA assessment unless he is enrolled, but the only way to become enrolled is to *pass* the IOWA

assessment, which he cannot do because of his disability." ROA.383. The district court never addressed this argument. *See* ROA.1020–73.

The district court's rule mirrors the absurdities from the famous novel:

> *"Catch 22. Catch-22 says they have a right to do anything we can't stop them from doing."* ….
> *"Didn't they show it to you?" Yossarian demanded, stamping out in anger and distress. "Didn't you even make them read it?"*
> *"They don't have to show us Catch-22," the old woman answered. "The law says they don't have to."*
> *"What law says they don't have to?*
> *"Catch-22."*

Joseph Heller, *Catch-22*, 761–62 (1961).

If the only way to challenge Willow's systemic exclusion of intellectually disabled students is to become "enrolled," then no such student will ever be able to challenge the exclusion, because only students who pass the test are eligible to enroll. And intellectually disabled students cannot, by definition, attain the minimum score. This is not speculative: Willow has **zero** intellectually disabled students. ROA.1274–77.

### D. The district court's "charter dominant" exception has no basis in the text and leads to absurd results.

The district court invented a novel exception to the IDEA: a "charter dominant" exception. ROA.1035. According to the district court:

> In a traditional school district, a residence-based obligation works because one LEA, the school district, serves children according to residence within the district, and thus only one LEA … is responsible for ensuring a child has access to a FAPE. *But in a charter-dominant district, like Orleans Parish*, a student residing in the district may attend any number of charter-school LEAs within the school-district LEA.

*Id.* (emphasis added). In other words, the district court carved out an exception to the IDEA, which applies only to the City of New Orleans.

There are "more than 13,000 separate school districts" in the United States. *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 211 (2021) (Alito, J., concurring). But New Orleans has a "unique public school system," in which nearly all public schools are charter schools. ROA.17; ROA.1026. The term "unique" means "one of a kind." *Eagle Found., Inc. v. Dole*, 813 F.2d 798, 804 (7th Cir. 1987). Accordingly, the district court effectively concluded that, in the other 13,000 school districts nationwide, "residence" triggers IDEA obligations.

But in New Orleans—and *only* New Orleans—"enrollment" is the triggering event.

As Justice Scalia famously said, Congress "does not … hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). If Congress wanted to define certain schools' obligations as applying only to students who are "enrolled," it would have simply said that. Congress has the power to create a "charter-dominant" exception to the IDEA. Federal judges do not.

Premising IDEA obligations on "enrollment" would undermine the purpose of the law and create absurdities. Before making the extremely consequential decision of *enrolling* in a certain school, parents in New Orleans obviously want to be assured that the school will provide their child a FAPE. But, under the district court's "charter-dominant" exception, these families "would have to enroll their child in public [charter] school with no information about the type of program the [charter school] may offer, where the child may be placed, or even if the [charter school's] IEP would constitute a FAPE." *See Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1069–70 (D.N.J. 2011). The

IDEA does not permit such a "Hobson's choice." *See A.Z. v. Mahwah Twp. Bd. of Educ.*, No. 04-4003, 2006 WL 827791, at *6 (D.N.J. Mar. 30, 2006).

Consider, for example, a military family with a special-needs child, and the service member is transferred to New Orleans. Before enrolling, however, they want to meet with a few different charter schools to determine which one will best meet their child's needs. Under the district court's "charter dominant" exception, the charter schools could "rebuff[]" the family. *James*, 228 F.3d at 768. They could "slough off any response to [their] duty until the parents either performed the futile act of enrolling their son for one day and then withdrawing him as soon as the IEP was complete, or, worse, leaving the child in an arguably inadequate program for a year just to re-establish his legal rights." *Id.*

### E. Louisiana law premises IDEA obligations on "residence," not enrollment.

The district court is correct that the IDEA allows States some flexibility to determine how IDEA obligations "are allocated among state and local agencies." ROA.1033 (citing *Manchester Sch. Dist. v. Crisman*, 306 F.3d 1, 9–10 (1st Cir. 2002)). But the court failed to examine Louisiana law. To be sure, it examined state-level *regulations*. But it

disregarded the *statutes* that those regulations implement. It goes without saying that statutes carry more force than regulations.

### 1. *Louisiana law looks to "residence" in the district.*

The relevant statute is the Educational Opportunities for Students with Exceptionalities Act. La. R.S. § 17:1941, *et seq*. It provides that LEAs have IDEA obligations to "every student … *who is a resident*," La. R.S. § 17:1941, which is defined as a child living "within the geographical boundaries of the [LEA] in which the student's parent or parents *have their legal residence*," *id.* at § 17:1942(B)(3). Thus, as explained in *Herbert*, "under Louisiana law," it is the child's "residence" that "determine[s]" whether the LEA has IDEA obligations. *Herbert*, 177 F.4th at 640 (citing La. R.S. § 17:1942(B)(3)(a)).

### 2. *The district court relied on a Louisiana regulation that, read literally, says Willow has IDEA obligations only to students <u>residing inside the school building</u>.*

The district court relied on a Louisiana regulation (which neither party briefed) that defines an LEA's "jurisdiction" as extending to "all students residing within [the LEA's] geographic area." 28 La. Admin. Code Pt XLIII, 230(D)(2). But, according to this regulation, a charter

school's "geographic area" extends only to the "*boundary of the educational facility*." ROA.1034. That is: the school building.

Put another way, the district court's *sua sponte* review of this regulation led to the conclusion that Willow has IDEA obligations only to students who "reside" at 5624 Freret St, New Orleans, LA 70115—which is no one, because no students "reside" at Willow's school building. The court recognized that, "read literally," this regulation is absurd. ROA.1034. It nonetheless relied on this self-evidently absurd regulation by cross-referencing another state regulation that was not briefed. La. Admin. Code tit. 28, pt. XLIII, § 230(B)(2)(a)(ii) (providing that charter schools must "provide all identification, evaluation, and special education and ELL services to students enrolled at the school"). From this, the court concluded that it must be "enrollment" that triggers an LEA's obligations under the IDEA. ROA.1035–36.

But this regulation merely provides a *floor*, not a *ceiling*, for a charter school's obligations. It is obvious that LEAs have IDEA obligations to students who are enrolled (provided that they are bonafide residents). And nothing in Section 230(B)(2)(a)(ii) places an outer limit on these obligations. The district court's cramped reading would "turn

special education into a game of poker, where a school district does not have to show its cards until *after* the parents have taken the gamble of enrolling their child." *Moorestown*, 811 F. Supp. 2d at 1070 at 1070–71.

### F. New Orleans' school system must operate within the IDEA's framework—not the other way around.

Federal judges cannot rewrite federal statutes simply because an unexpected issue arises. The IDEA long predates New Orleans' charter-school model. Accordingly, Orleans Parish schools must operate *within the IDEA's framework*—not the other way around. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) ("unexpected applications of broad language reflect only Congress's 'presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions'") (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012)).

But the district court created an "ad hoc exception" that applies only to New Orleans, *see id.*, which is "unique" in its status as the only "charter dominant" school district in the country, ROA.1026. It worried that "[i]f residency was to trigger" IDEA obligations, the statute "would be flipped on its head," because "multiple LEAs could simultaneously owe a FAPE to the same child," which would "create overlapping and indeterminate

obligations." ROA.1035. But this would not "flip" the IDEA on its head—it is precisely what the IDEA was designed to do.

America is a country where people are free to move around, and there are often "overlapping or indeterminate obligations" among school districts. *E.g.*, *D.C. v. Abramson*, 493 F. Supp. 2d 80, 86 (D.D.C. 2007) ("Just because Connecticut may have [IDEA] responsibilities of its own … does not relieve [the District of Columbia] from having to fulfill its own responsibilities as the LEA of residence to evaluate the student and make FAPE available."). In addition, students in New Orleans have the right to transfer from one charter school to another, which necessarily creates "overlapping" obligations among various charter schools. *See* ROA.1035. New Orleans elected to create a majority-charter school system, which is its prerogative and comes with many benefits. But such a system must conform itself to the IDEA—not the other way around.[3]

The district court's approach gives schools in New Orleans privileged status. Take Jefferson Parish, for example, which has just a

[3] To the extent the district court's concern was that families might randomly file IDEA lawsuits against schools they have never contacted or applied to, this concern is unfounded, and any such cases would be dismissed for lack of Article III standing. *See Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 174 (5th Cir. 2018).

handful of charter schools.[4] If a family is deciding between one of the many "traditional" schools or one of the charter schools, then the Jefferson Parish School Board and the charter schools may have "overlapping" obligations to create a contingent IEP for the child. *See* ROA.1035; *L.T.*, 342 F. Supp. 3d at 621 (requiring school district to provide a "contingent IEP" for a child who was not enrolled). Just across the parish line, however, schools in New Orleans have a get-out-of-the-IDEA-free card, so long as the child has not yet "enrolled."

Put simply, this judicially invented "charter-dominant" exception is wrong. It has no basis in text. It flies in the face of prior court decisions on the subject. It runs counter to the spirit of the IDEA and creates an untenable Catch-22. And it serves no purpose other than letting charter schools in New Orleans—and *only* New Orleans—off the hook.

### G. Federal law is supreme.

Willow spent a great deal of time citing Louisiana law. Even assuming its admissions process complied with state law (it does not),[5] states cannot give public schools permission to violate the ADA or the

[4] Jefferson Parish Schools, *Charter Schools*, https://www.jpschools.org/our-schools/special-programs

[5] *See* ROA.687 at n.11 (explaining that a standardized test is not an "academic record" under La. R.S. § 17:3991).

IDEA. Federal law is supreme. U.S. Const. art. VI, Cl. 2. Allowing Willow to skirt its obligations under the ADA or IDEA by filtering out intellectually disabled students would "frustrate[] the purposes" of these laws. *See City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988); *see also R.B.*, 762 F. Supp. 2d at 762 ("[T]o the extent that IDEA might conflict with that state law, it prevails under the Supremacy Clause.").

## II. Under Title II of the ADA, O.E. plausibly alleges that he was "excluded" from eligibility "by reason of" his disability, and no "intentional discrimination" is required to state a claim.

In 1990 Congress enacted the Americans with Disabilities Act, finding that "historically, society has tended to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101. The ADA is aimed at not only "outright intentional exclusion," but also "exclusionary qualification standards and criteria. 42 U.S.C. § 1210(a)(5). Title II applies to "public entities." 42 U.S.C §§ 12131–34.

While the IDEA "imposes an affirmative obligation" to provide a FAPE to students, Title II of the ADA "broadly prohibit[s]" discrimination against disabled persons. *D.A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010). Even when an LEA has "fully satisfied its IDEA obligations," a student can "still pursue claims under the ADA … on the

grounds that the student was prevented from receiving a state benefit ... provided to her non-disabled peers." *Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 513–14, 521 (5th Cir. 2024).

### A. Under the plain text, O.E. was "excluded" from eligibility to attend Willow "by reason of" his disability.

There is no dispute that, as a public school, Willow is a "public entity." *See* 42 U.S.C. § 12132. Nor does anyone deny that O.E. was "excluded" from Willow and/or "deni[ed] its benefits." *See id.* Thus, the only question is whether the complaint plausibly alleges that the exclusion or denial occurred "by reason of" O.E.'s intellectual disability. *See id.*

O.E. has plausibly alleged that his intellectual disability is the "reason" he is ineligible to attend Willow. He resides in the geographic zone, he is the right age, and he timely completed all the required paperwork. ROA.20–21 at ¶¶ 74–80. The *only* thing that made him ineligible was his failure to achieve the minimum score on the IOWA assessment—something he cannot do because of his disability. But for this disability-related barrier, he would be on equal footing with all other applicants in the lottery.

By definition, an intellectually disabled person has "*subaverage* general intellectual functioning." *Randall v. Astrue*, 570 F.3d 651, 653 (5th Cir. 2009) (emphasis added). This reflects an intelligence level that is "two or more standard deviations from the mean score on a standardized intelligence test." *Hall v. Fla.*, 572 U.S. 701, 711–13 (2014) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 37 (5th ed. 2013)). And it is common sense that performing reading and math requires *intellectual functioning*.

The district court conceded that "some level of cognitive ability is needed to 'pass' an achievement test," ROA.1048, but never explained how a child with "subaverage" intellectual functioning could *ever* attain an *above-average* score on a reading/math test. In this regard, it does not matter what accommodations, if any, Willow provided *during* the test, because the *test itself* is the barrier. A child without arms, for instance, can never do a push up or a pull-up, no matter how much extra time he is given. Here, the precise skill being tested—academic achievement—is a skill O.E. is definitionally impaired in.

### B. The district court erred by concluding that Title II requires a showing of "intentional discrimination."

The district court concluded that Title II prohibits only "intentional discrimination." ROA.1042–44. This conclusion is directly at odds with both the plain text and this circuit's longstanding precedent.

#### 1. *Under longstanding precedent, "intent" is not required to prove a violation and win an injunction.*

It is well established that "while [e]vidence of intentional discrimination is necessary to support a claim for monetary damages," a "plaintiff seeking only equitable relief may succeed on a *disparate impact theory*." *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) (emphasis added). In other words, "intent" is "the distinguishing element of whether a plaintiff is entitled to damages, rather than merely equitable relief." *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 573 (5th Cir. 2018). Indeed, the Supreme Court reaffirmed just last year that Title II plaintiffs can prove a "statutory violation and obtain injunctive relief … *without proving intent to discriminate*." *A.J.T.*, 605 U.S. at 344.[6]

---

[6] Lower courts "derived this standard" from the Supreme Court's Title IX caselaw. *A.J.T.*, 605 U.S. at 345 n.4.

Other cases confirm that Title II requires no "intent." For example, this Court held that when a public entity builds a sidewalk that is "inaccessible to individuals with disabilities without adequate justification," it "discriminates within the meaning of Title II." *Frame v. City of Arlington*, 657 F.3d 215, 231 (5th Cir. 2011) (en banc). Because the plaintiffs sought "injunctive relief but not damages," the "intent" of the city was irrelevant. *Id.* at 221, 239 n.124 (explaining that, because "damages are available under Title II … only for intentional discrimination," the "class of cases in which money damages will be available for inaccessible sidewalks thus would appear to be small").

Similarly, *Tennessee v. Lane* concerned a paraplegic man forced to "crawl" up the courthouse stairs to attend a hearing on the second floor, because the courthouse had no elevator. 541 U.S. 509, 514 (2004). The Supreme Court held that Congress validly abrogated States' sovereign immunity, even as to conduct or policies "that are discriminatory in effect, if not in intent." *Id.* at 520. It explained that certain facially neutral policies "will often have the same practical effect as outright exclusion." *Id.* at 531.

Here, O.E. has plausibly alleged that Willow "ma[d]e its school "inaccessible to individuals with [intellectual] disabilities without adequate justification." *See Frame*, 657 F.3d 231. The testing policy may be facially neutral, but it has "the same practical effect as outright exclusion." *Lane*, 541 U.S. at 531. Whether Willow *intended* for its school to be inaccessible to O.E. is legally irrelevant, at least when it comes to obtaining injunctive relief. *Miraglia*, 901 F.3d at 573.

**2. *The plain text requires no showing of intent.***

"Here, as in all of law, text is king." *Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023). The word "intent" appears nowhere in Title II. 42 U.S.C. § 12131–34. And a closer look at the text confirms that no intent is required. Section 12132 reads as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

There are two ways in which O.E. can be harmed:

1) he is "<u>excluded from participation in</u>" or "<u>denied the benefits of</u>" Willow's educational program, <u>*or*</u>

2) he is "subjected to <u>discrimination by</u>" Willow.

*Id.* In either case, the harm must result "by reason of" the disability. *Id.*

The second clause—"discrimination"—refers to "less favorable treatment," *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), and such treatment is necessarily carried out with "intent," *see Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 670 (7th Cir. 1996). But O.E. concedes that he was not treated differently.

Thus, only the first clause is at issue here: "exclu[sion]" or "deni[al]" of benefits. 42 U.S.C. § 12132. And an "exclusion" or "denial" does not require any "intent" to be unlawful. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909–10 (6th Cir. 2004) (explaining that, by "separate[ly] identifying" these prohibitions, Section 12132 "demands more of public entities than simply refraining from intentionally discriminating against disabled individuals").

Another clue that Title II requires no intent is its use of the phrase "by reason of." 42 U.S.C. § 12132. This phrase merely "denotes some form of causation." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 769 (2018). And causation "differs from 'intent,' which is 'the mental resolution or determination to do" an act.'" *United States v. Leahy*, 152

F.4th 1356, 1373 (11th Cir. 2025) (quoting *Intent*, Black's Law Dictionary (12 ed. 2024)).

Also relevant, the phrase "by reason of" employs passive voice. "The passive voice focuses on an event that occurs without respect to a specific actor, and therefore *without respect to any actor's intent or culpability*." *Dean v. United States*, 556 U.S. 568, 572 (2009) (emphasis added). Thus, if O.E.'s disability prevents him passing the assessment, then his exclusion necessarily occurs "by reason of" his disability. 42 U.S.C. § 12132. Willow's "intent" is irrelevant. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 75 (2023) ("Passive voice pulls the actor off the stage.").

#### 3. *Prohibiting only "intentional" discrimination would lead to absurd results.*

Disability discrimination is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). The district court's decision is fundamentally at odds with this common understanding and would lead to absurd results.

For example, the plaintiff in *Lane* would have needed to prove that the State of Tennessee engaged in a "sinister" plot to "consciously exclude[e]" paraplegics from the second floor of the courthouse. *See*

ROA.1045–46. The wheelchair users in *Frame* would have needed to show that the City of Arlington deliberately conspired to prevent them from using the city's sidewalks. Requiring disabled citizens to prove that their government "intentionally or consciously" made certain programs inaccessible to them would turn the ADA into an empty promise. *See* ROA.1045.

### C. Willow denied O.E. a reasonable modification.

Unlike most antidiscrimination laws, the ADA does not merely prohibit disparate treatment. It goes further by "impos[ing] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The terms "reasonable modification" and "reasonable accommodation" are used interchangeably. *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 235 n.6 (5th Cir. 2017). If a modification of a generally applicable policy "is required" to obtain equal access, then the public entity is "liable simply by denying it." *Bennett-Nelson*, 431 F.3d at 455.

A request for a "reasonable modification" is analyzed under a burden-shifting framework. First, the plaintiff must show that the

modification is "generally reasonable, or … reasonable in the run of cases." *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059–60 (5th Cir. 1997). If so, the defendant "must make the requested modification unless the defendant *pleads and meets its burden of proving* that the requested modification would fundamentally alter the nature of" its services, programs, or activities. *See id.* at 1059 (emphasis added); *see also Frame*, 657 F.3d 232; *Lane*, 541 U.S. at 532.

As explained below, O.E. plausibly alleges that waiving the assessment for him is a "generally reasonable" modification, and Willow did not plead a "fundamental alteration" defense. But the district court asserted this affirmative defense *on Willow's behalf*. It then made multiple legal errors in analyzing the claim.

#### 1. *Waiving the assessment for O.E. is a "generally reasonable" modification.*

O.E. plausibly alleges that the proposed modification is reasonable "in the general sense." *Johnson*, 116 F.3d at 1059. He requested an individualized waiver of its testing requirement. ROA.23. Providing the accommodation would not have cost Willow any money—all it would have needed to do is waive the test for one person. Doing so would not have guaranteed O.E. a place in the school—rather, it would have entered him

into the lottery, alongside other students hoping to be admitted. ROA.21. Thus, O.E. plausibly alleges a "generally reasonable" modification. *See Johnson*, 116 F.3d at 1059–60.

Notably, neither Willow nor the district court identified *any* modification, short of outright waiver, that would give O.E. equal access to Willow. A student with ADHD, for example, may thrive on such an assessment if given appropriate accommodations, such as extra time or a quiet testing environment. Similarly, a blind student without any cognitive impairments may do well, if given the test in Braille or having the questions read aloud. In both instances, Willow would be removing the *disability-related barrier* between the student's knowledge and their ability to convey that knowledge.

But these accommodations will not help O.E., who has brain abnormalities that cause "profound cognitive delays." ROA.16; ROA.119–26. O.E. does not merely have a *learning* disability (like ADHD or dysgraphia) which may require accommodations—he has *intellectual* disability. *See United States v. Lewis*, No. 08-cr-404, 2010 WL 5418901, at *7 (N.D. Ohio Dec. 23, 2010) (citing the DSM-IV and explaining that, while intellectually disabled have "subaverage IQs that are *consistent*

*with* their low academic achievement," people with "learning disabilities show *a discrepancy between* their IQs and poor academic achievement") (emphasis added). With the "cognitive function … of a 1- or 2-year-old child," ROA.14, O.E. will never score in the 50th percentile on a test that assesses fourth-grade-level math and reading skills. In other words, the test itself is the barrier, not the manner in which Willow administered it.

### 2. *Willow did not raise the "fundamental alteration" defense; instead, the district court improperly invoked the defense on Willow's behalf.*

An "affirmative defense" is "usually waived if not affirmatively pled." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 271 (5th Cir. 1999). Willow did not raise the "fundamental alteration" defense in any of its briefing in the district court. ROA.522–28, 530–69, ROA.662–64. By failing to raise this defense, Willow waived it—at least for purposes of the motion to dismiss and motion for preliminary injunction. *Lee v. United States*, 765 F.3d 521, 523–24 (5th Cir. 2014) (failure to invoke affirmative defense "results in waiver," though the defendant may later "raise[] the issue at a pragmatically sufficient time," so long as "the plaintiff is not prejudiced in its ability to respond").

Because Willow failed to assert the fundamental-alteration defense, the district court's "focus" should have been "limited to whether [O.E.] has identified [a modification] reasonable 'in the run of cases.'" *See Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 684 (5th Cir. 1996). But the district court raised the affirmative defense on Willow's behalf, opining that the testing requirement is "essential" and that waiving it for O.E. "would result in a fundamental alteration." ROA.1051–52. ROA.1052. This was improper.

"Judges are not like pigs, hunting for truffles buried in briefs." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). By invoking defenses Willow did not assert, the district court clearly departed from the "party presentation" principle. *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (explaining that our "adversarial system" is "designed around the premise that … parties represented by competent counsel … are responsible for advancing the facts and argument"). Willow never argued that its test was "essential," or that waiving it for O.E. would 'fundamentally alter" its educational program. The district court made these arguments for Willow and denied O.E. any

"opportunity" to brief this issue. *See Day v. McDonough*, 547 U.S. 198, 210 (2006).

On this ground alone, this Court must reverse. For example, this Court deemed it error for a district court to "introduce[] [an affirmative] defense" into the litigation where the defendant had "failed to plead" it. *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342–43 (5th Cir. 1988). The other side had "no notice" that the issue "would be important in the litigation until the time had passed to meet the issue squarely." *Id.* at 343. That is *precisely* what the district court did.[7]

#### 3. ***The district court misallocated the burden of persuasion.***

When a district court "misallocate[s] the burden of proof," it constitutes reversible error. *Wink v. Rowan Drilling Co.*, 611 F.2d 98, 100 (5th Cir. 1980); *Conestoga Tr. v. Columbus Life Ins. Co.*, 759 F. App'x 227, 235 (5th Cir. 2019). The district court not only asserted the "fundamental alteration" defense on Willow's behalf, but also placed the burden on O.E. to *disprove* that defense. It faulted O.E. for "alleg[ing] no

[7] The district court improperly tried to assist Willow in asserting this defense during oral argument, but Willow *still* failed to squarely invoke it. ROA.1115–16, ROA.1128–29; ROA.1136–39.

facts whatsoever regarding Willow's … mission, purpose, role, … curriculum, instruction, or *program*." ROA.1052–53 (emphasis added).

But it is *Willow's* job to "demonstrate" the "nature" of its "program." *See Frame*, 657 F.3d at 233; 28 C.F.R. § 35.130(b)(7)(i). O.E. merely needs to show that he requested a "generally" reasonable modification—one that is reasonable "in the run of cases." *See Johnson*, 116 F.3d at 1059. It is up to Willow, which is far more familiar with its own educational program, to explain how/why that program would be fundamentally altered by waiving the entrance exam for one student. *See id.* (explaining that the "fundamental alteration" defense "focus[es] on the specific circumstances" of the program "rather than on reasonableness in general").

By requiring O.E. to plead the finer points of Willow's "curriculum, instruction, or *program*," the district court placed the burden on O.E. to explain why modifying the policy would *not* fundamentally alter the nature of its "program." That was error. *Wink*, 611 F.2d at 100.

#### 4. *Even if the "fundamental alteration" defense had been properly raised, it would fail as a matter of law, because Willow is an LEA.*

Even assuming Willow had raised this affirmative defense, it would fail as a matter of law. Willow established itself as an LEA under the IDEA. ROA.17; ROA.194. That means that it agreed to educate "all students, regardless of the severity of their disabilities." *See Honig*, 484 U.S. at 324. This includes students with "severely limit[ed] … cognitive functioning." *A.J.T.*, 605 U.S. at 338–40.

Accepting intellectually disabled students cannot sensibly work a "fundamental alteration" to the nature of Willow's educational program within the meaning of Title II, because Willow is *statutorily required* to educate such students under the IDEA. LEAs must educate a "wide spectrum of handicapped children," from the "marginally" impaired to the "profoundly retarded." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 202 (1982). Thus, Willow cannot legally condition admission on a child's "mastery of academic content." ROA.1048.

The district court did not explain how a school that is statutorily required to educate "profoundly" disabled students like O.E. could ever

genuinely need a *preadmission* exam—let alone how such an exam would be "essential." Instead, it wrote that, "taken to its logical conclusion, O.E.'s argument would eliminate all discretionary admissions criteria in public education, even at the postsecondary education level." ROA.1053. But "postsecondary education" institutions are *not* required to educate "all students, regardless of the severity of their disabilities." *See Honig*, 484 U.S. at 324.

In other words, the district court missed the distinction between elementary schools, which are covered by the IDEA, and "postsecondary" schools, which are not. O.E.'s cognitive impairments render him "[in]capable of satisfying the academic and technical requirements set" by colleges or postgraduate institutions, even "with the aid of reasonable accommodations." *See McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 855 (5th Cir. 1993). Likewise, *private* elementary schools are not required to provide "special education"—only "reasonable accommodations" that allow a student to keep up in the general curriculum. *See* 42 U.S.C. § 12182. But Willow is a *public elementary* school. And such schools must provide "*special* education" to students

with "severely limit[ed] … cognitive functioning," including "instruction tailored to meet [their] unique needs." *A.J.T.*, 605 U.S. at 338–40.

Notably, when questioned during the preliminary-injunction hearing, the school's CEO was unable to explain why Willow would be unable to make exceptions of its testing requirement for intellectually disabled students:

> Q: Is there any reason why Willow could not have an advanced program to challenge students within the school while also accepting students of all abilities, including, intellectual disabilities?
>
> A: I don't know. I'm sure there's a procedure to interrupt the current mission of the school. It's very difficult for me to answer that question. Do I know of a process or procedure for that? I am not exactly sure.

ROA.1263–65.

In short, there is no plausible basis for Willow to argue that it would "fundamentally alter" its educational program to provide special education to O.E. Willow could maintain its "rigorous academic program," ROA.261, while still educating students with intellectual disabilities.

### 5. *The district court identified the wrong "service, program, or activity."*

The district court identified the wrong "service, program, or activity." 42 U.S.C. § 12132. It analyzed the *admissions process*, not the *school itself*. The court concluded that, because Willow's testing requirement "constitutes the largest component of the eligibility matrix," it is "central to the admissions determination," making it "fundamental to the nature of Willow's program." ROA.1052.

But the relevant "program" at issue in this case is Willow's *educational* program (i.e., attending the school)—not the *process to gain admission* to that program. Once admitted to Willow, a student's score on the IOWA assessment becomes irrelevant and is no longer an impediment. Stated differently, O.E. was not demanding access to the *admissions process*; he accessed that "program" just fine. The "service, program, or activity" to which he sought access was the *school itself*. 42 U.S.C. § 12132; *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 787–88 (8th Cir. 2012) (Title II "applies to anything a public entity does").

Accordingly, the district court's suggestion that O.E. might not be "qualified" to attend Willow is based on a faulty premise. ROA.1052. But for the IOWA assessment, he would have been placed in the lottery: he

resides in the district, is school-age, and timely completed all the application requirements. ROA.20–21 at ¶¶ 74–80. Those are the only "essential" eligibility requirements to attend Willow. *See Herbert*, 177 F.4th at 638 (holding that "reside[nce]" in the parish was an "essential eligibility requirement"). Holding otherwise would improperly "define[]" Willow's educational program "in a way that effectively denies *otherwise* qualified handicapped individuals the meaningful access to which they are entitled." *Alexander*, 469 U.S. at 301 (emphasis added).

#### 6. *Whether the assessment "measures intelligence," as opposed to "achievement," is legally irrelevant.*

The label used to describe Willow's assessment—whether as an "achievement" test, an IQ test, or something else—is legally irrelevant. *Bostock*, 590 U.S. at 664 ("[I]t's irrelevant what an employer might call its discriminatory practice."). It does not matter whether the IOWA assessment "measures intelligence" the way an IQ test does. *See* ROA.1047. All that matters is that it tests reading and math, which O.E. *cannot do because of his disability*.

It is certainly true that a child's IOWA score "is affected by a host of factors, like prior schooling, parental involvement, home life, personality traits, et cetera." ROA.1048. But the district court ignored

the elephant in the room: an *intellectually disabled* student, by definition, will never attain a 50th-percentile score, even with the most ideal "prior schooling, parental involvement, [or] home life." We know this is true because Willow has *zero* intellectually disabled students. ROA.1275–77.

#### 7. *At a minimum, O.E. is entitled to discovery on the "fundamental alteration" issue.*

At a minimum, O.E. should be afforded discovery on this issue. "Affirmative defenses to ADA claims such as this are typically fact-based and not capable of resolution on the basis of the pleadings alone." *Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017). Indeed, whether a modification 'constitutes a 'fundamental alteration''' is often too "complex" to be decided even at "summary judgment." *Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009).

### D. Willow "consciously" designed its testing policy to exclude students with intellectual disabilities.

Another theory of Title II liability is "conscious" discrimination. Unlike the denial of a reasonable accommodation, this theory is premised on the motivation of the actor. *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034–35 (5th Cir. 2022). To survive under Rule 12, the plaintiff must plausibly allege a "discriminatory goal" or "motive." *Id.*

### 1. *The district court failed to apply the "mixed motive" framework.*

Title II employs a "mixed motive" framework. *Id.* at 1035. That is, disability discrimination need not be the "sole" factor animating a decision for it to be unlawful. *Id.* A plaintiff can prove "conscious" discrimination so long as her disability "played a role" in the challenged action. *Id.* at 1034. If the decision was motivated "in part" by a discriminatory goal, then the conduct is unlawful. *Id.* at 1035.

The district court admitted that "it is possible that Willow may have adopted the Iowa Assessment, *at least in part*, to exclude students with intellectual disabilities." ROA.1046. From that conclusion alone, the court should have found that O.E. states a claim for "conscious" discrimination. *Pickett*, 37 F.4th at 1034–35. But it dismissed the conscious-discrimination theory based on its belief that there are "more likely explanations" for the decision. ROA.1046.

In using the phrase "more likely explanations," the court was quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). But *Iqbal* involved an "equal protection" claim under the Fifth Amendment, *see id.* at 675, which requires proving that the challenged action was taken *"solely* because of" a protected characteristic, *Adarand Constructors, Inc. v.*

*Pena*, 515 U.S. 200, 215 (1995). In stark contrast, Title II does *not* require sole causation. *Pickett*, 37 F.4th at 1034–35.

Thus, the district court's belief that there are "more likely explanations" is legally irrelevant, because "[a]n explanation need not be the most likely to be plausible" under Title II. *Id.* at 1034. Courts must consider the possibility that "at least two reasons" motivated the creation of the test. *Id.* They cannot pick and choose which one they think is "more likely." That is the province of a jury.

#### 2. *The district court admitted that it's plausible that Willow uses the test, "at least in part," to exclude students with intellectual disabilities.*

As noted, the district court conceded that "Willow may have adopted the Iowa Assessment, ***at least in part***, to exclude students with intellectual disabilities." ROA.1046. This inference does not require much work. Willow's stated motivation behind its testing requirement is to create a "high academic" school for students who "require a challenge." ROA.1063; ROA.246–47. And the corollary of this motivation, of course, is that Willow does *not* want students who cannot keep up with its "rigorous academic program," ROA.261, which necessarily includes intellectually disabled students. Thus, the complaint plausibly alleges

that the desire to exclude students with intellectual disabilities at least "played a role" in the decision to use the assessment. *Pickett*, 37 F.4th at 1034–35.[8]

It does not matter whether this was Willow's primary motivation. For example, a school may want to give "preference" to certain racial minorities—not out of any animus against whites or Asians, but to right "past wrongs." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214–15, 226 (2023). Though perhaps a "commendable goal," the natural consequence of such a policy is discrimination against *other* applicants on the basis of *their* race. *Id.* The only difference here is that Willow's admissions policy favors able-minded students over the intellectually disabled.

### E. O.E. plausibly alleges that the policy has a disparate impact on students with intellectual disabilities.

The district court concluded that the disparate-impact theory is not "cognizable," because Title II requires a showing of "intentional discrimination." ROA.1042–44. This conclusion is difficult to square

[8] The district court focused on the "secrecy" surrounding the test and the "windfall" Willow receives by accepting money to educate disabled students it will never enroll. ROA.1044–47. But these were merely background details in the complaint, and nothing rises or falls with them.

with its treatment of the reasonable-modification theory—a theory that *also* requires no "intentional discrimination" but was accepted by the district court as cognizable. ROA.1049–55. After all, "both theories … allege that a public entity's facially neutral rule specially burdens disabled individuals' meaningful access." *Sosa v. Mass. Dep't of Correction*, 80 F.4th 15, 31 (1st Cir. 2023).

This Court need not split hairs, at this stage, as to which precise theory O.E.'s claim alleges. *See Frame*, 657 F.3d at 231 n.71 ("We express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination*, a form of disparate impact discrimination,* or something else entirely"); *Ability Ctr. of Greater Toledo*, 385 F.3d at 905 n.4. That said, the district court's determination that disparate-impact discrimination is "not cognizable" flatly contradicts the plain text and longstanding precedent.

#### 1. *The district court erred by sua sponte raising this issue.*

The district court did not deny that Willow's policy, in fact, has a disparate impact on students like O.E. Instead, it concluded that this theory of liability is "not cognizable." ROA.1042–44. It reached this

conclusion *sua sponte*, as Willow did not offer *any* arguments challenging the disparate-impact theory. ROA.1040 (acknowledging that "Willow's motion addresses only the conscious-discrimination and failure-to-accommodate theories").

Though "not hidebound by the precise arguments of counsel," courts cannot "takeover" the case and concoct their "own arguments" that the parties failed to present. *Sineneng-Smith*, 590 U.S. at 379. Instead, they "normally decide only questions presented by the parties." *Id.* at 376. But the district court "radical[ly] transform[ed]" the case by introducing its own "theory" that no party presented. *See id.* Indeed, its analysis contains several pages' worth of cases Willow did not cite and statutory arguments Willow did not make. ROA.1041–44.

While courts do have some discretion to "act[] on [their] own initiative," they "must accord the parties fair notice and an opportunity to present their positions" before doing so. *Day*, 547 U.S. at 210. That did not happen. On this ground alone, this Court can reverse. *Sineneng-Smith*, 590 U.S. at 379.

### 2. *The text prohibits disparate-impact discrimination.*

As explained, the plain text of Section 12132 prohibits disparate-impact discrimination by using the term "excluded … by reason of" disability. *See* Part II.B *supra*. And this Court's caselaw confirms that "disparate impact" is cognizable. *T.O.*, 2 F.4th at 417; *Miraglia*, 901 F.3d at 575. Indeed, the Fifth Circuit is in good company: every other circuit recognizes that "disparate-impact" discrimination is cognizable under Title II.[9] In any event, several other provisions of Title II, as well as the ADA's generally applicable provisions, confirm that disparate-impact discrimination is covered.

*First*, Section 12101(a) prohibits "exclusionary qualification standards and criteria." 42 U.S.C. § 12101(a)(5). Thus, Congress expressed, in statutory text applicable to the statute *as a whole*, that

[9] *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012) (Gorsuch, J.) (explaining that "conduct that had an unlawful disparate impact on the disabled" violates Title II and that, "[u]nlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination"); *see also Ability Ctr. of Greater Toledo*, 385 F.3d at 908; *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006); *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003); *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021); *Sosa*, 80 F.4th at 30; *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008); *Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016); *DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008).

"outright intentional exclusion" is merely one way a defendant violates the ADA. Another way is by using "exclusionary qualification standards and criteria." *Id.*

*Second*, Section 12134 confirms that disparate-impact discrimination is proscribed. Congress expressly directed the Department of Justice to implement Title II regulations "consistent with" the already-existing regulations under Section 504 of the Rehabilitation Act. 42 U.S.C. § 12134. At that time, the Section 504 regulations prohibited recipients of federal funds from "utiliz[ing] *criteria or methods of administration* … [t]hat have the *effect* of subjecting qualified handicapped persons to discrimination on the basis of handicap." 28 C.F.R. § 41.51(b)(3)(i) (emphasis added).

Thus, the statutory text of Title II *requires* regulations that prohibit disparate-impact discrimination. Following this clear directive, the DOJ promulgated a regulation prohibiting the use of "eligibility criteria that screen out or tend to screen out an individual with a disability." 28 C.F.R. § 35.130(b)(8). Critically, this regulation "simply appl[ies]" the plain text of Title II and "do[es] not prohibit conduct that Title II permits." *Frame*,

657 F.3d at 224, 231 n.71. That is, nothing in Title "permits" public schools to use entrance exams. *See id.*

Courts have been applying 28 C.F.R. § 35.130(b)(8) for decades.[10] But the district court cast it aside without a second glance. ROA.1043 at n.149. In doing so, it failed to afford the "respect" that is "historically given to Executive Branch interpretations." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95, 399 (2024).

Significantly, Congress *re-enacted* the ADA in 2008—18 years after the DOJ's regulations took effect. Pub. L. No. 110-325, 122 Stat. 3553 (2008). And "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But Congress did not touch 28 C.F.R. § 35.130(b)(8). Thus, Congress "ratified" the DOJ's interpretation. *See United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 135 (1978).

---

[10] *See, e.g.*, *Doe v. Jud. Nominating Comm'n for Fifteenth Jud. Cir. of Fla.*, 906 F. Supp. 1534, 1542–45 (S.D. Fla. 1995) (striking down state agency's requirement that candidates for judicial office disclose "information about past [mental health] treatment" because such "forced disclosure of information relating to disabilities … screens out, or tends to screen out, the disabled"); *ACLU of Indiana v. Individual Members of the Indiana State Bd. of L. Examiners*, No. 1:09-CV-842-TWP-MJD, 2011 WL 4387470, at *7–9 (S.D. Ind. Sept. 20, 2011) (enjoining a similar practice by a state bar association).

*Third*, Section 12201(a) confirms that disparate-impact discrimination is prohibited. This "Miscellaneous Provision[]" is applicable to the statute as a whole. 42 U.S.C. § 12201. It provides that the ADA cannot be "construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. 790 et seq.) *or the regulations issued by Federal agencies pursuant to such title*." 42 U.S.C. § 12201(a) (emphasis added).

Thus, Congress instructed—once again, in statutory text—that courts cannot "constru[e] Title II to apply a lesser standard" than Section 504 "*and its implementing regulations*." *Frame*, 657 F.3d at 228 (emphasis in original). Because the Section 504 regulations prohibit disparate impact discrimination, 28 C.F.R. § 41.51(b)(3)(i), courts must construe Title II "to grant at least as much protection," *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998).

#### 3. *The district court's statutory analysis is flawed and would lead to absurd results.*

The district court attached importance to the fact that the text of "Title I (employment) and Title III (public accommodations) both contain disparate-impact language, but Title II does not." ROA.1043. Instead, this language is found "only in the regulations of Title II." ROA.1043

(citing 28 C.F.R. § 35.130(b)(8)). The court concluded that this "omission" deserves "weight" and that recognizing disparate-impact discrimination under Title II would, somehow, "render the disparate-impact language in Titles I and III superfluous." *Id.*

This "omission" analysis is self-contradictory, because the court deemed the reasonable-modification theory cognizable, *see* ROA.1049–55, even though that language is found "only in the regulations of Title II," *see* ROA.1043; 28 C.F.R. § 35.130(b)(7)(i). Following the district court's logic, public entities would not be required to provide "reasonable accommodations" or "reasonable modifications." After all, the text of Title I and Title III both explicitly require covered entities to make "modifications," 42 U.S.C. § 12112(b)(5)(A); § 12182(b)(2)(A), but the text of "Title II does not" explicitly require reasonable modifications, *see* ROA.1043.

This reading would also create absurd results: the ADA would regulate *private businesses* more strictly than state and local *governments*. A public school could turn away disabled students more easily than a private school across the street. *See* 42 U.S.C. § 12182(b)(2)(A). Or, a disabled adult working at a private school would

have more legal protections than a disabled child attending a public school. 42 U.S.C. § 12112(b)(3).

This Court has previously disregarded Title II's lack of "similarly explicit definition[s]" of discrimination as immaterial. *Windham*, 875 F.3d at 235. And the legislative history confirms that Title II should be read in harmony with Titles I and III. *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 266 (5th Cir. 1997) ("Where a statute is silent or ambiguous as to an issue, we next look to the legislative history for guidance as to the intent of the legislators."). In particular, the House Report states that, while Congress "chose[] not to list all the types of actions that are included within the term 'discrimination', as was done in titles I and III," it "intend[ed] … that the forms of discrimination prohibited by [Title II] *be identical to those set out in the applicable provisions of titles I and III of this legislation*." H.R. REP. 101-485 (II).

#### 4. *Even assuming there were any ambiguity in Title II, such ambiguity "must be resolved in plaintiff's favor" on a Rule 12 motion.*

In the district court's view, whether Title II covers disparate impact is "indeterminate." ROA.1043. Respectfully, that is wrong, for all the reasons identified above. But even if true, the district court still erred,

because at the motion-to-dismiss stage, "any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor." *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022).

In baseball, a tie goes to the runner. Under Rule 12, an "indeterminate" legal landscape must be resolved in favor of letting the claim proceed. *See id.* This principle is especially important for civil rights laws like the ADA. The ADA is a "remedial" statute, *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1069 (5th Cir. 1995), and "remedial legislation should be construed broadly to effectuate its purposes," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

### F. O.E. plausibly alleges "actual notice" of a violation, which would entitle him to *damages*, in addition to equitable relief.

As explained, to win *damages* (not just an injunction), a Title II plaintiff must prove not only "disparate impact," but also "intentional" discrimination. *Miraglia*, 901 F.3d at 573–75. But "intent" in this context is far different from the "sinister" discrimination the district court envisioned. *See* ROA.1045–46. It requires no showing of "personal ill will or animosity." *A.J.T.*, 605 U.S. at 344–45.

Instead, proving "intent" merely requires proving that the conduct was carried out with "actual notice of a violation." *Miraglia*, 901 F.3d at 573–75. For example, this Court affirmed a damages award under Title II because a police officer verbally interrogated a deaf man, even though he clearly knew the man was deaf. *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 571–76 (5th Cir. 2002). The plaintiff did not need to prove that the officer harbored animus against deaf people. Instead, he proved "intentional" discrimination through the officer's "knowledge" that he needed an accommodation. *Id.* at 570–71.

O.E.'s complaint plausibly alleges that Willow had "actual notice" that its testing requirement excluded him. ROA.29 at ¶ 147. Willow was notified, in painstaking detail, precisely how its policy violates the law. ROA.272–73. Thus, O.E. has alleged that Willow had "actual knowledge" that he needed an "accommodation" from the policy. *See Smith v. Harris Cnty., Texas*, 956 F.3d 311, 319 (5th Cir. 2020).

In any event, whether and to what extent Willow had "actual notice" or acted with "deliberate indifference" is a fact-intensive question that cannot be resolved on a motion to dismiss. *Garrett v. Thaler*, 560 F. App'x 375, 380 n.3 (5th Cir. 2014) (question of "deliberate indifference" is

a "fact-intensive inquir[y] not easily determined without discovery"). Thus, it is premature, at the pleading stage, to make any determinations as to Willow's "actual notice." *See Miraglia*, 901 F.3d at 573–75 (reversing damages award because there was no "findings" that defendant "had notice" of a violation); *J.H. v. Prator*, No. 20-30110, 2021 WL 3376524, at *3 (5th Cir. Aug. 3, 2021) (noting that "intent is 'quintessentially' a fact issue").

Finally, even assuming the complaint, as written, fails to adequately allege "actual notice" of a violation, that would justify only dismissing O.E.'s claims for damages—not outright dismissal. But the district court dismissed the claims entirely. *See Taylor v. City of Shreveport*, 798 F.3d 276, 287 (5th Cir. 2015) (affirming district court's order "to the extent it dismissed Plaintiffs' claim for damages under the Rehabilitation Act," but "revers[ing] and remand[ing]" to allow the plaintiffs "to pursue their injunctive and declaratory claims"). If this Court were to conclude that the complaint fails to adequately allege "actual notice" under *Miraglia* to obtain damages, then it should allow O.E. to amend his complaint, given that O.E. never previously amended his complaint. *See Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).

## III. The district court erred by denying the motion for a preliminary injunction, as it employed incorrect legal standards and made clearly erroneous findings of fact.

This Court "review[s] the denial of a preliminary injunction for an abuse of discretion." *Jones v. Texas Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* The district court's ruling is flawed in various ways.

On the paper record alone, it was obvious that using the IOWA assessment "exclude[s]" intellectually disabled students. 42 U.S.C. § 12132. The evidentiary hearing removed all doubt: multiple top-ranking officials at Willow admitted that, out of 2,300 students, **zero** are intellectually disabled. ROA.1275–77. And they could not identify which steps in the admissions process, other than the IOWA assessment, "uniquely disadvantage" students with intellectual disabilities. ROA.1418–22.

### A. O.E. is substantially likely to prevail on the merits.

The district court relied on the same legal errors in denying preliminary injunctive relief. ROA.1069–71 (finding that O.E. was not likely to prevail on the merits "for the [same] reasons" it dismissed the

ADA claim and IDEA claim). Accordingly, its denial of O.E.'s motion for a preliminary injunction must be reversed. *H & W Indus., Inc. v. Formosa Plastics Corp.*, 860 F.2d 172, 180–81 (5th Cir. 1988) (holding that district court applied incorrect legal analysis and "revers[ing] the denial of the preliminary injunction based on this legal error").

In addition, many of the court's factual findings are clearly erroneous. Most notably, it euphemized the disparity, finding that that "less than five percent of Willow's students had intellectual disabilities." ROA.1065; ROA.1070. **But the true number is zero**. Saying that "less than five percent" are intellectually disabled is technically true, in the same way that black students comprised "less than five percent" of students in "whites only" schools during the Jim Crow era. But characterizing the school population this way creates the false impression that Willow could have as many as 115 students with intellectual disabilities. The true number, which was repeated throughout the hearing, was zero. ROA.1220–21; ROA.1274–77; ROA.1292–96; ROA.1423.

The district court's "statistical" analysis was also flawed, as it cherrypicked "two other" schools, rather than compare Willow to

statewide or citywide data. Statewide, intellectually disabled students comprise 11% of public-school students. ROA.1291; ROA.1521. And there are 66 schools in New Orleans, but the district court cherrypicked just "two other[s]": Bricolage Academy (0-5%) and Hynes Charter School (6%). ROA.1065, ROA.1070. It inexplicably ignored the other 63 schools.

Worse yet, the district court concluded that these two schools reported "nearly the same percentages" as Willow. ROA.1070. But this is clearly erroneous, because *Willow's percentage is zero percent*. Hynes has *six* percent. ROA.1521. 0% and 6% are not "nearly the same." As for Bricolage, there was no evidence presented at the hearing about its specific percentage, meaning that its population of intellectually disabled students could be as high as 3%, 4%, or even 4.9%. *See* ROA.1521.

Moreover, the fact that these two schools do not use "selective admissions" criteria does not mean they are not *also* violating the law in other ways that would affect enrollment. Bricolage, for example, has repeatedly been reprimanded for its treatment of special-education students. Marta Jewson, *NOLA Public Schools issues warning to Bricolage Academy over special education services*, The Lens (Oct. 19,

2021).[11] Many parents of special-education students might, understandably, avoid such a school.

Finally, the district court relied on vague statements about students who supposedly have "borderline intellectual functioning." ROA.1065; ROA.1070. But this refers to people with an intellectual functioning range much higher than O.E.'s. *See* ROA.1276. Moreover, Willow had no idea whether these students' "borderline" diagnosis had already manifested *when they sat for the IOWA assessment*, or some time thereafter. ROA.1352–55.

Even more notable, Willow admitted that *none* of its "borderline" students exclusively take special-education classes. ROA.1276–77 (admitting that all of its students participate in the "general-education curriculum"). Whereas 15% of students statewide are in special-education classrooms most of the day, Willow *has no special-education* classrooms. ROA.1294–95; ROA.1522; ROA.1220–21. Nor do any Willow students sit for the "LEAP Connect" test, a statewide assessment tailored for intellectually disabled students that is taken by 12% of public-school

[11] https://thelensnola.org/2021/10/19/nola-public-schools-issues-warning-to-bricolage-academy-over-special-education-services/

students statewide. ROA.1295–96; ROA.1523. Even Bricolage and Hynes—which the district court cherrypicked—respectively have 8% and 14% of students taking LEAP Connect. ROA.1523. Thus, the district court's comparison to some unnamed "borderline" students, who take general-education classes and the regular LEAP assessment, was clearly erroneous.

**B. The other factors weigh heavily in favor of a preliminary injunction.**

Because it believed O.E. was not likely to prevail on the merits, the district court did not address the "other factors" for obtaining a preliminary injunction. ROA.1071. Accordingly, the district court is due no deference, and this Court reviews these factors de novo.

First, irreparable injury is easily satisfied. ROA.386. When, as here, "a civil rights statute is violated, irreparable injury should be presumed from the very fact that the statute has been violated." *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987). Even without such a presumption, it cannot be denied that a disability-based exclusion causes irreparable harm. *See Certain Named & Unnamed Non-Citizen Child. & Their Parents v. Texas*, 448 U.S. 1327, 1333 (1980) (holding that "delay in entering school will tend to exacerbate

the deprivations already suffered”); *S-1 v. Turlington*, 635 F.2d 342, 345 (5th Cir. 1981) (affirming preliminary injunction because “two years of education had been irretrievably lost”).

Second, the equities weigh strongly in O.E.’s favor. ROA.387. As an initial matter, it’s doubtful this factor applies at all, because the ADA and the IDEA expressly provide for injunctive relief. *U.S. v. San Francisco*, 310 U.S. 16, 30–31 (1940) (“When Congress expressly provides for an injunction, there is no need to “balance[e] [the] equities.”). Assuming it does, Willow identified no harm in the district court. ROA.653–54. Moreover, if O.E. is likely to prevail on the merits, then the equities necessarily weigh in his favor, because Title II’s burden-shifting framework already includes a balancing of interests. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

Last, it cannot sensibly disserve the public interest to “merely uphold and enforce a federal statute.” *Union Planters Bank v. Gavel*, No. 02-1224, 2002 WL 975675, at *6 (E.D. La. May 9, 2002). That is, while Willow may have some “discretion” in its admissions policies, that

discretion "does not extend so far as to" allow policies that "interfere with" O.E.'s statutory rights. *See Deerfield Med. Ctr.*, 661 F.2d at 338–39.

## CONCLUSION

For the foregoing reasons, O.E. prays that this Court reverse the district court's grant of Willow's motion to dismiss and denial of O.E.'s motion for a preliminary injunction.

Respectfully submitted,

June 28, 2026

/s/ *Chris Edmunds*

Chris Edmunds, Counsel for Plaintiff-Appellant
LBSA: 37670
Chris Edmunds Law Office
740 Dante St., New Orleans LA 70118
(504) 314-0034
chrisedmundslaw@gmail.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies as follows:

This brief complies with the type-volume limitation in Rule 32(a)(7)(b)(i) of the Federal Rules of Appellate Procedure, because, excluding the parts exempted under Fed. R. App. 32(f) and 5th Cir. R. 32.2, this brief contains 12,995 words.

This brief complies with the typeface requirements of Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure, because it has been prepared in a proportionally spaced typeface in Microsoft Word (version 16.51) in Century Schoolbook. The text is prepared in 14-point font, and the footnotes are prepared in 12-point font.

*/s/___Chris Edmunds____*
Attorney for Plaintiff-Appellant

Date: June 28, 2026

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of this filing shall be served upon all counsel of record through the Court's electronic filing system.

*/s/___Chris Edmunds____*
Attorney for Plaintiff-Appellant

Date: June 28, 2026