26-30174

# In the United States Court of Appeals for the Fifth Circuit

*O.E., by and through his parents, C.E. and C.E.*,

Plaintiff-Appellant,

v.

*Advocates for Arts-Based Education Corporation, d/b/a The Willow School*,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:25-cv-1054

---

# REPLY BRIEF OF PLAINTIFF-APPELLANT

Christopher F. Edmunds,
LSBA # 37670
Chris Edmunds Law Office
813 S. Carrollton Ave.,
New Orleans, LA 70118

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**TABLE OF CONTENTS ........................................................................ 2**

**TABLE OF AUTHORITIES ................................................................. 5**

**ARGUMENT......................................................................................... 9**

**I. Willow does not deny that it is impossible for an intellectually disabled child to pass its assessment. ................................................9**

**II. Willow is an "independent public school." .......................................9**

**III. The OPSB is not involved in Willow's admissions policies. ....... 10**

**IV. Willow concedes it is its "own" LEA that is statutorily required to educate intellectually disabled students. .................................. 10**

**V. O.E. plausibly alleges Willow violated Title II of the ADA. ........ 11**

**A. O.E. is "qualified" to attend Willow. ............................................ 11**

**B. Title II's "intent" standard applies only to *damages* and has no bearing on injunctive relief. ......................................................... 12**

**C. O.E. plausibly alleges that Willow had "actual notice" that its policy excluded him, which satisfies the "intent" standard for damages. .................................................................................... 13**

**D. O.E. plausibly alleges "conscious" discrimination, and Willow does not address Title II's "mixed motive" framework. ........... 15**

**E. O.E. plausibly alleges denial of a reasonable modification. .... 16**

1. Willow does not deny that waiver of the assessment is reasonable "in the run of cases." ..........................................................................16

2. Willow waived the "fundamental alteration" defense at the motion-to-dismiss stage, and district courts cannot *sua sponte* assert defenses..16

3. The "fundamental alteration" defense fails as a matter of law, because Willow is statutorily required to educate students with intellectual disabilities. ..........................................................................18

4. That the assessment is the "largest component" of the admissions process does not make it "essential" to educating students who have already been admitted. ....20

5. The district court improperly placed the burden of persuasion on O.E. to *disprove* the defense. ....21

6. At a minimum, O.E. is entitled to discovery. ....21

**F. O.E. alleged the disparate-impact theory, and the district court had no authority to *sua sponte* develop arguments challenging this theory. .... 22**

**G. Willow's disparate-impact arguments are meritless. .... 23**

1. Willow's attempt to distinguish *Miraglia* is misplaced, because O.E. seeks injunctive relief. ....23

2. The text of Section 12132 speaks in "results-oriented language." ....24

3. Willow's "omission" theory would, if accepted, nullify public entities' duty to provide "reasonable modifications." ....24

4. *Kamps* and *Sandoval* are inapposite, because they involved fundamentally different statutes. ....25

a. Race and age discrimination involve different interests than disability discrimination. .... 26

b. Title II does not have the "same textual structure" as these statutes. .... 27

c. Title VI and the "Age Discrimination Act" are Spending Clause statutes; Title II is not. .... 29

d. This Court declined to apply *Sandoval* to Title II in *Frame*. .... 30

e. *Sandoval* is inapposite because the parties *agreed* that Title VI did not prohibit disparate-impact discrimination. .... 31

**VI. Residence, not enrollment, triggers the IDEA. .... 32**

**A. Willow fails to address La. Rev. Stat. § 17:1942. .... 32**

**B. In light of *Herbert*, Willow disavows its "enrollment" theory and repackages it as a "placement" theory, which lacks merit for the same reasons. .......... 33**

1. The OPSB *matches* students with charter schools; it does not "place" them. .......... 34
2. Section 230(D)(5) merely implements 20 U.S.C. § 1412 and has nothing to do with charter schools in New Orleans .......... 36
3. Willow's "placement" theory creates the same "Catch 22" as its enrollment theory. .......... 38

**C. Willow's "site selection" argument is meritless, because Willow is an LEA with only one "site." .......... 39**

**VII. The Court should preliminarily enjoin Willow. .......... 39**

**CONCLUSION .......... 42**

**CERTIFICATE OF COMPLIANCE .......... 43**

# TABLE OF AUTHORITIES

## CASES

*A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025) ........ 12, 18, 20, 23

*Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004) ........ 24, 26

*Alexander v. Choate*, 469 U.S. 287 (1985) ........ 12, 17, 26

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........ 25, 31

*Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243 (5th Cir. 2017) ........ 17

*Ambrose v. St. Johns Cnty. Sch. Bd.*, 664 F. Supp. 3d 1322 (M.D. Fla. 2023) ........ 12

*Block v. Texas Bd. of L. Examiners*, 952 F.3d 613 (5th Cir. 2020) ........ 19

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ........ 28

*Clark v. Amoco Prod. Co.*, 794 F.2d 967 (5th Cir. 1986) ........ 17

*Day v. McDonough*, 547 U.S. 198 (2006) ........ 23

*Delano-Pyle v. Victoria County,* 302 F.3d 567 (5th Cir. 2002) ........ 13

*Doss v. S. Cent. Bell Tel. Co.*, 834 F.2d 421 (5th Cir. 1987) ........ 22

*Drinker v. Colonial Sch. Dist.*, 78 F.3d 859 (3d Cir. 1996) ........ 37

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc) . 28, 30

*Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582 (1983) ........ 29

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ........ 26

*Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630 (5th Cir. 2026) .. 11, 33

*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017) ........ 21

*James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764 (6th Cir. 2000) ....................38

*Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997)....................16, 17, 21

*Kamps v. Baylor University*, 592 F. App'x 282 (5th Cir. 2014) (unpublished) ....................25, 26

*King v. Burwell*, 576 U.S. 473 (2015)....................27

*Lee v. United States*, 765 F.3d 521 (5th Cir. 2014)....................17

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................32

*Luke v. Texas*, 46 F.4th 301 (5th Cir. 2022)....................41

*Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565 (5th Cir. 2018)....................13, 14, 23

*Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057 (D.N.J. 2011)....................39

*Morris v. Homco Int'l, Inc.*, 853 F.2d 337 (5th Cir. 1988)....................17

*O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004)....................41

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)....................27

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ....................29

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ....................30

*Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013 (5th Cir. 2022)....................15, 16

*Shaikh v. Texas A&M University College of Medicine*, 739 F. App'x 215 (5th Cir. 2018)....................19, 22

*Smith v. EMC Corp.*, 393 F.3d 590 (5th Cir. 2004) ....................14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ....................15

*T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407 (5th Cir. 2021)............23
*Taylor v. City of Shreveport*, 798 F.3d 276 (5th Cir. 2015).....................13
*Tennessee v. Lane*, 541 U.S. 509 (2004) ...............................................26
*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).......................................................24, 25, 28
*U.S. v. City of Jackson, Mississippi*, 318 F. Supp. 2d 395 (S.D. Miss. 2002).........................................................................................41
*United States v. Female Juv.*, 103 F.3d 14 (5th Cir. 1996).....................33
*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ..........................23
*United Transp. Union v. Fla. E. Coast Ry. Co.*, 586 F.2d 520 (5th Cir. 1978)...................................................................................17, 18
*Vardeman v. City of Houston*, 55 F.4th 1045 (5th Cir. 2022).................30
*White v. Ascension Parish Sch. Bd.*, 343 F.3d 373 (5th Cir. 2003)...34, 39
*Windham v. Harris Cnty., Texas*, 875 F.3d 229 (5th Cir. 2017).......14, 25
*Wink v. Rowan Drilling Co.*, 611 F.2d 98 (5th Cir. 1980) ......................21
*Wise v. Ohio Dep't of Educ.*, 80 F.3d 177 (6th Cir. 1996).................37, 38

**STATUTES**

42 U.S.C. § 12101...............................................................................28
42 U.S.C. § 12132.................................................................11, 20, 24, 25
42 U.S.C. § 12134...............................................................................28
42 U.S.C. § 12201(a) ..........................................................................28
42 U.S.C. § 2000d...........................................................................25, 31
42 U.S.C. § 6101.................................................................................25
Fed. R. Civ. P. 15 ...............................................................................14
La. R.S. § 17:1942(B)(3) ......................................................................32

La. R.S. § 17:3973 ....................................................................9, 10
La. R.S. § 17:3995(B) .......................................................................35
La. R.S. § 17:3996 ............................................................................ 9

**OTHER AUTHORITIES**

Louisiana Department of Education, *Students with Significant Cognitive Disabilities*.......................................................................40
NOLA Public Schools, *K-12 Family Enrollment Manual*.......................35

**REGULATIONS**

28 C.F.R. § 35.130(b)(8) ...................................................................28
28 C.F.R. § 35.151(a)..........................................................................30
28 La. Admin. Code Pt XLIII,§ 116(A)(2)(c) .........................................39
28 La. Admin. Code Pt XLIII,§ 230(D) .................................................32
28 La. Admin. Code Pt XLIII,§ 230(D)(5) ................................34, 36, 38

# ARGUMENT

## I. Willow does not deny that it is impossible for an intellectually disabled child to pass its assessment.

Willow's brief never addresses the central issue in this case: how can a boy with the cognitive function of a typical "1- or 2-year-old" child" ever score in the 50th percentile on a reading/math test? ROA.14. Willow effectively concedes that this is impossible.

## II. Willow is an "independent public school."

As a matter of state law, Willow is an "independent public school." La. R.S. § 17:3973(2)(a). Willow concedes it has "operational autonomy." Red Br. at 5; ROA.468, ROA.1266–67. Still, it suggests that, because New Orleans happens to have many charter schools, it is not truly "independent of" the OPSB. Red Br. at 4.

New Orleans' "unique" status as a "charter dominant" city does not give schools in New Orleans any "unique" exemptions from federal law. Every charter school in the country has a "contractual relationship" with, and is subject to "oversight" by, the entity that granted the charter. *See* Red Br. at 4. Willow is a separate legal entity with its own independent legal obligation to "comply with" the ADA and the IDEA. La. R.S. § 17:3996(C)(1).

The only power the OPSB has over charter schools is to grant or reject charters. Its "oversight" begins and ends there. Once chartered, the school is "independent" of the OPSB. La. R.S. § 17:3973(2)(a).

## III. The OPSB is not involved in Willow's admissions policies.

Willow argues that the OPSB "mandates" a preadmissions test. Red Br. at 7, 50. Its chartering agreement says otherwise. It provides that Willow "*may*," but is not required to, use a "reading" or "math" score as part of its admissions "matrix." ROA.494. Thus, the OPSB does not require a preadmissions test at all. Even Willow's admissions director admits she has "never had a conversation with anyone at" the OPSB about Willow's admissions "eligibility" or "assessment." ROA.1358.

## IV. Willow concedes it is its "own" LEA that is statutorily required to educate intellectually disabled students.

Willow admits that it "elect[ed] to be its own LEA" and is thus "held to the same standards as school-district LEAs." Red Br. at 18. This concession is critical. While Willow argues that it is not "*O.E.*'s LEA," Red Br. at 21, it concedes that it is statutorily required to educate any intellectually disabled student who happens to be enrolled.

Willow's attorney conceded this point at the oral argument on the motion to dismiss:

> Willow does not dispute … that once the child is placed by NOLA-PS at Willow, that it has all of its IDEA restrictions. … [A]n example that was used was a student with a traumatic brain injury that was already admitted to Willow, … Willow would be required to do all of the things -- providing an appropriate IEP, provide appropriative supportive functions tailored to that student, provide an appropriate curriculum.

ROA.1179.

As explained later, this concession is fatal to Willow's "fundamental alteration" defense to the Title II claim. Willow cannot credibly argue that it would fundamentally alter its program to *admit* cognitively disabled students because it agreed to *educate* such students.

## V. O.E. plausibly alleges Willow violated Title II of the ADA.

### A. O.E. is "qualified" to attend Willow.

O.E. is "qualified" to attend Willow because he is the right age and resides in New Orleans. 42 U.S.C. § 12132. He therefore meets the "essential eligibility requirements." *Herbert v. St. James Par. Sch. Bd.*, 177 F.4th 630, 637–38 (5th Cir. 2026). Willow argues, for the first time on appeal, that O.E. is not "qualified" because "he did not achieve the minimum score," which is an "essential" qualification. Red Br. at 31–32.

But this lawsuit *challenges* that qualification. An "essential eligibility requirement" cannot be defined "in a way that effectively

denies *otherwise* qualified handicapped individuals the meaningful access to which they are entitled to." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (emphasis added). Beyond the discriminatory testing requirement, O.E. is "otherwise qualified." *See id.* Under Willow's logic, paraplegic students could not challenge a policy requiring prospective students to do 100 jumping jacks: paraplegics are not "qualified" to attend, because they cannot complete "the minimum" number of jumping jacks, which is "essential." Red Br. at 31–32.

At a minimum, this is a question of fact. *Ambrose v. St. Johns Cnty. Sch. Bd.*, 664 F. Supp. 3d 1322, 1330 (M.D. Fla. 2023) ("[D]istinguishing essential eligibility requirements from mere rules, policies, and practices is a fact-specific inquiry.").

### B. Title II's "intent" standard applies only to *damages* and has no bearing on injunctive relief.

Willow urges that Title II plaintiffs must show intent "to prevail" on their claims. Red Br. at 41. But Title II plaintiffs can prove a "*statutory violation and obtain injunctive relief* … without proving intent to discriminate." *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344 (2025) (emphasis added). "Intent" is required only to

obtain the additional relief of *damages*. *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574–75 (5th Cir. 2018).




If a complaint plausibly states a violation, but not *intent*, the court should dismiss only the damages claim—not the injunctive-relief claim. *See Taylor v. City of Shreveport*, 798 F.3d 276, 287 (5th Cir. 2015). But the district court dismissed the complaint *in its entirety*. This is error.

### C. O.E. plausibly alleges that Willow had "actual notice" that its policy excluded him, which satisfies the "intent" standard for damages.

O.E. plausibly alleges, at this early stage, that Willow had "actual notice" that he was excluded based on his disability. *See Miraglia*, 901 F.3d at 575. Just as the officer in *Delano-Pyle v. Victoria County* knew the deaf driver could not understand him, Willow knew that O.E. could not pass this test. 302 F.3d 567, 571–76 (5th Cir. 2002). Indeed, O.E.'s

pediatrician notified Willow that "he would score at or near the bottom percentile of all test takers" because of his disability. ROA.24 at ¶ 106.

Thus, this is not a case where the defendant merely "lack[ed] knowledge and understanding" about the disability or what type of accommodation was necessary. *Miraglia*, 901 F.3d at 575. It is *obvious* that an intellectual disability "limits a person's ability to" do reading and math. *See Windham v. Harris Cnty., Texas*, 875 F.3d 229, 239 (5th Cir. 2017) ("That deafness limits a person's ability to understand oral commands is plain; that cervical stenosis limits a person's ability to look straight ahead for a period of forty-five seconds is not."). To the extent the Court believes that more is required to plead this "actual notice" standard, O.E. should be granted leave to amend on remand. *See Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).[1]

[1] Willow believes O.E. faulted the district court "for not allowing him to amend his complaint." Red Br. at 43. Not so. O.E. merely said that if *this Court* finds that he has sufficiently alleged "actual notice," he should be "freely" given the opportunity to cure the deficiency. Fed. R. Civ. P. 15(a)(2). But amendment would have been futile with the *district court*, which failed to acknowledge the "actual notice" standard.

### D. O.E. plausibly alleges "conscious" discrimination, and Willow does not address Title II's "mixed motive" framework.

As O.E. explained, "conscious discrimination" claims under Title II are governed by a "mixed motive" framework. Blue Br. at 57–60. But Willow does not address this framework or deny that the district court failed to apply it. Thus, it does not deny that the district court erred by concluding that there are "more likely explanations," ROA.1046, because discrimination need not be the "most likely" explanation to be plausible, *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034–35 (5th Cir. 2022).

Nor does Willow deny that it "may have adopted the Iowa Assessment, ***at least in part***, to exclude students with intellectual disabilities." Blue Br. at 58–59 (quoting ROA.1046). To the contrary, Willow concedes it wants only students with "grade-level mastery." Red Br. at 30. This *definitionally* excludes intellectually disabled children. *Cf. Students for Fair Admissions, Inc. v. Harvard Coll.*, 600 U.S. 181, 218–19 (2023) ("A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter.").

Thus, this Court can easily conclude that O.E. plausibly alleges that Willow consciously designed its testing policy, at least in part, to exclude students like O.E. *See Pickett*, 37 F.4th at 1034–35.

### E. O.E. plausibly alleges denial of a reasonable modification.

#### 1. Willow does not deny that waiver of the assessment is reasonable "in the run of cases."

Willow does not deny that the modification O.E. requested is "reasonable in the run of cases," because the test is a disability-based barrier to his admission. Blue Br. at 46–48. Accordingly, O.E. satisfies his *prima facie* burden, and the burden shifts to Willow to "plead[] and meet[] its burden of proving" that waiving the test for O.E. would "fundamentally alter" its educational program. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997). But Willow did not "plead"—much less *prove*—this defense.

#### 2. Willow waived the "fundamental alteration" defense at the motion-to-dismiss stage, and district courts cannot *sua sponte* assert defenses.

Willow does not deny that it never raised the "fundamental alteration" defense. Thus, the defense is waived, at least at the motion-to-dismiss stage. *Lee v. United States*, 765 F.3d 521, 523–24 (5th Cir.

2014). The Court should reverse on this ground alone. *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342–43 (5th Cir. 1988).

Willow argues that the district court was empowered to raise this defense on Willow's behalf because it "appears on the face of the complaint." Red Br. at 43 (citing *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017)). Not so. Willow must affirmatively "plead" this defense. *Johnson*, 116 F.3d at 1059–60.

The Fifth Circuit has never given district judges carte blanche to *raise* affirmative defenses. Instead, it has merely held that an affirmative defense, *if raised by the defendant*, can be adjudicated through a Rule 12 motion, so long as the defense "appear[s] on the face of the complaint." *Alexander*, 875 F.3d at 249. Ordinarily, affirmative defenses "rest[] on issues of fact." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 971 (5th Cir. 1986). But some defenses can be successfully asserted through a motion to dismiss, because they are facially apparent. *See United Transp. Union v. Fla. E. Coast Ry. Co.*, 586 F.2d 520, 527 (5th Cir. 1978) (affirming dismissal, on Rule 12 motion, based on facially apparent statute-of-limitations defense).

In either case, however, the defendant must "raise[]" the defense. *See id.* (explaining that, although "most properly raised in an answer," affirmative defenses "can *be raised* by motion to dismiss"). Thus, whether the fundamental-alteration defense "appears on the face of the complaint" is irrelevant because *Willow did not raise it*.

#### 3. The "fundamental alteration" defense fails as a matter of law, because Willow is statutorily required to educate students with intellectual disabilities.

Even if district courts could *sua sponte* assert and develop defenses, this affirmative defense fails as a matter of law. Willow is its "own LEA," subject to the "same standards" as other LEAs. Red Br. at 18. Thus, it agreed, as a matter of federal law, to provide "tailored" education for students with "severely limit[ed] … cognitive functioning." *A.J.T.*, 605 U.S. at 338–40. It cannot "fundamentally alter" Willow's program to require it to do something it *agreed* to do.

In other words, waiving its "grade-level mastery" requirement does not "alter" Willow's educational program because Willow concedes that it must educate disabled students *regardless of whether they are at grade level*. *See* ROA.1179 (admitting that it must provide a specially "tailored" education to an "already-admitted" student who later suffers a

"traumatic brain injury" rendering him intellectually disabled). Boiled down, Willow's position is that, although it must *educate* intellectually disabled students who are admitted, it would "fundamentally alter" its school to *admit* any such students. This position is untenable.

Critically, Willow's own CEO admitted that having a high-achieving school and educating students like O.E. are not mutually exclusive. Questioned under oath, she could think of no reason "why Willow could not have an advanced program" while "also accepting students" like O.E. ROA.1263–65. At a "fundamental" level, Willow's "program" provides *education*. It cannot "fundamentally alter" this program to provide *special* education to O.E.

Willow relies heavily on cases outside the K-12 context. Red Br. at 31. But the defendants in those cases were not required to provide ***special*** education. Bar associations have no obligation to lower standards for basic legal competence. *Block v. Texas Bd. of L. Examiners*, 952 F.3d 613, 618 (5th Cir. 2020). And medical schools need not lower academic standards for future doctors. *Shaikh v. Texas A&M University College of Medicine*, 739 F. App'x 215 (5th Cir. 2018)).

But Willow is a *public elementary school*. And LEAs like Willow must educate students with "severely limit[ed] … cognitive functioning," which requires "special education" "tailored to" their "unique needs." *A.J.T.*, 605 U.S. at 338–40. It cannot fundamentally alter Willow's program to require it to *admit* intellectually disabled students when it concedes it must *educate* such students.

**4. That the assessment is the "largest component" of the admissions process does not make it "essential" to educating students who have already been admitted.**

Like the district court, Willow asserts that because the IOWA assessment is the "largest component" of its admissions decision, waiving it would be unreasonable. Red Br. at 31. This argument is circular: the assessment is essential because it's the "largest component" of the admissions decision, and it's the largest component of the admissions decision because it's "essential." ROA.1052.

Moreover, Willow is focusing on the wrong "service, program, or activity." 42 U.S.C. § 12132. Public entities provide all sorts of services, and a disabled person may be able to access some programs, but not others. Blue Br. at 55–56. Though the "largest component" of its *admissions* program, the IOWA assessment is not a component of

Willow's *educational* program. Once admitted to Willow, a student is on equal footing with all other students; her score on the IOWA assessment no longer has any importance. Accordingly, the assessment cannot sensibly be "essential" to the educational program.

**5. The district court improperly placed the burden of persuasion on O.E. to *disprove* the defense.**

Willow does not deny that the district court "misallocated the burden" of persuasion by requiring *O.E.* to *disprove* this affirmative defense. Blue Br. at 50–51. On this ground alone, this Court should reverse. *Wink v. Rowan Drilling Co.*, 611 F.2d 98, 100 (5th Cir. 1980).

**6. At a minimum, O.E. is entitled to discovery.**

"Affirmative defenses to ADA claims such as this are typically fact-based and not capable of resolution on the basis of the pleadings alone." *Hindel v. Husted*, 875 F.3d 344, 347 (6th Cir. 2017). Willow must "prove" that waiving the assessment for one student would "fundamentally alter" its school. *Johnson*, 116 F.3d at 1059–60. And O.E. is entitled to take discovery and challenge that evidence.

### F. O.E. alleged the disparate-impact theory, and the district court had no authority to *sua sponte* develop arguments challenging this theory.

Willow argues that O.E. "never made a disparate impact claim in his Complaint." Red Br. at 42. But his complaint alleges that the test "screens out" students with intellectual disabilities and has "a discriminatory *effect*." ROA.26.

Willow never challenged this theory. The first mention of this theory being not "cognizable" was the district court's order. ROA.1041–44. The district court felt empowered to raise the argument on Willow's behalf based on a misreading of this Court's Rule 12 caselaw. ROA.1040 at n.137 (citing *Shaikh*, 739 F. App'x at 221 n.6. for the proposition "[o]n a motion to dismiss, a court []must examine the complaint to determine if the allegations provide for relief of *any* possible theory"').

The district court has it backwards. Courts must *decline* to dismiss a complaint, even if the plaintiff "pleads an improper legal theory," so long as the defendant has "fair notice" of "*any possible theory*." *Doss v. S. Cent. Bell Tel. Co.*, 834 F.2d 421, 424 (5th Cir. 1987) (emphasis added). But courts cannot *dismiss* claims based on novel statutory arguments that the plaintiff has no notice of. *See United States v. Sineneng-Smith*,

590 U.S. 371, 375–79 (2020); *Day v. McDonough*, 547 U.S. 198, 210 (2006).

### G. Willow's disparate-impact arguments are meritless.

This Court, along with every other circuit court, has recognized that Title II prohibits disparate-impact discrimination. Blue Br. at 63 n.9. Willow's arguments lack merit.

#### 1. Willow's attempt to distinguish *Miraglia* is misplaced, because O.E. seeks injunctive relief.

In *Miraglia*, this Court held that "intent" is the "distinguishing element" between "equitable" relief and "damages." 901 F.3d at 573–74. Willow's only answer to *Miraglia* is that the plaintiff was, in fact, "required to prove intent." Red Br. at 40. But that is because his equitable-relief claims were "moot." *Miraglia*, 901 F.3d at 572.

By contrast, O.E.'s equitable-relief claims are very much still alive. *See id.* And if "intent" is an *additional* element needed to recover damages, then the logical corollary is that intent is *not* required to obtain relief *other than* damages. *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021). Indeed, that is exactly what the Supreme Court recently said, noting that no "intent" is needed to "establish a statutory violation and obtain injunctive relief." *A.J.T.*, 605 U.S. at 344.

#### 2. The text of Section 12132 speaks in "results-oriented language."

Willow does not deny that, unlike being "subjected to discrimination," an "exclu[sion]" requires no intent. Blue Br. at 43 (citing *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909–10 (6th Cir. 2004)). Nor does it deny that the phrase "by reason of" merely "denotes some form of causation" and speaks in "passive voice." Blue Br. at 43–44. Accordingly, Willow does not deny that O.E.'s disability *caused* his "exclu[sion]." 42 U.S.C. § 12132.

The Court need not go any further. Section 12132 uses "results-oriented language." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533–34 (2015) (holding that Fair Housing Act prohibits disparate-impact discrimination). And when the text of "[a]ntidiscrimination laws … refers to the consequences of actions" rather than an actor's "intent" or "mindset," they "must be construed to encompass disparate-impact claims." *Id.*

#### 3. Willow's "omission" theory would, if accepted, nullify public entities' duty to provide "reasonable modifications."

The load-bearing premise of Willow's statutory argument is the district court's "omission" theory. Red Br. at 36. But it does not deny

that, under this interpretation, public entities would have no obligation to provide "reasonable modifications." Blue Br. at 67. After all, that term is also "omitted" from Section 12132. 42 U.S.C. § 12132.

This interpretation would also mean that Congress intended to regulate private businesses "more strictly" than state and local *governments*. Blue Br. at 67. Such a holding plainly contradicts with Congress' "statutory purpose." *See Inclusive Communities Project, Inc.*, 576 U.S. at 533. Put simply, Willow reads far too much into Title II's lack of "similarly explicit definition[s]" of discrimination. *See Windham*, 875 F.3d at 235.

**4. *Kamps* and *Sandoval* are inapposite, because they involved fundamentally different statutes.**

Willow relies on cases interpreting different statutes. In *Kamps v. Baylor University*, 592 F. App'x 282 (5th Cir. 2014) (unpublished), this Court interpreted the Age Discrimination Act, 42 U.S.C. § 6101, *et seq*. And *Kamps* relied on *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001), which concerned Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, *et seq*. Willow argues that Title II has the "same textual structure" as these statutes, which it says must "yield[] the same result." Red Br. at 35–37.

But these statutes do not have the same "textual structure." And even if they did, they implicate different forms of discrimination and were enacted under different congressional powers. Thus, the same structure would not yield the "same result."

**a. Race and age discrimination involve different interests than disability discrimination.**

Age and race discrimination implicate significantly different interests than disability discrimination. Unlike race/age discrimination, disability discrimination is "most often" caused by "benign neglect." *Choate*, 469 U.S. at 295. Thus, the same "textual structure" should not compel the same result. Red Br. at 35–37.

The Sixth Circuit said so in *Ability Center*. Distinguishing *Sandoval*, it concluded that "Title II does more than prohibit public entities from intentionally discriminating," because public entities must also remove "barriers that impede disabled individuals from securing the benefits of public services." *Ability Ctr.*, 385 F.3d at 907 (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)).[2] Notably, this Court relied on *Ability Center* in its *Kamps* decision. *See* 592 F. App'x at 286.

[2] *See also Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003).

**b. Title II does not have the "same textual structure" as these statutes.**

Title II does not have the same "textual structure" as Title VI or the Age Discrimination Act. Willow cherry-picks Section 12132, while ignoring Title II's *other* provisions that expressly, or by reference to Section 504's regulations, prohibit disparate-impact discrimination. 42 U.S.C. §§ 12101(a)(5); 12201, 12134. These provisions are part and parcel of Title II's "textual structure" and cannot be ignored. *King v. Burwell*, 576 U.S. 473, 486 (2015) (courts "construe statutes, not isolated provisions").

*First*, Willow minimizes Section 12101(a)(5) because it appears "thirty-one subsections" before Section 12132. Red Br. at 39. But the importance of statutory provisions does not turn on their physical proximity to one another. Congress's "findings and purpose" are "applicable to the entire statute," including Title II. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

The Supreme Court has held that, through Section 12101, Congress intended Title II to encompass a "more comprehensive view" of "discrimination." *Id.* This includes the "discriminatory *effects*" of "exclusionary qualification standards and criteria." 42 U.S.C.

§ 12101(a)(5) (emphasis added). By contrast, Title VI and the Age Discrimination Act contain no similar "purpose or findings."

*Second*, Willow does not address 42 U.S.C. § 12134. Thus, it does not deny that the statutory text of Title II *requires* regulations prohibiting disparate-impact discrimination. *See* Blue Br. at 64–65. Nor does it deny that Congress amended the ADA in 2008, was "aware of" 28 C.F.R. § 35.130(b)(8), and ratified this disparate-impact regulation when it "made a considered judgment to retain the relevant statutory text." *Inclusive Communities Project, Inc.*, 576 U.S. at 536.

*Third*, Willow ignores 42 U.S.C. § 12201(a), which prohibits construing Title II to a "lesser standard" than Section 504's regulations, which plainly prohibit disparate-impact discrimination. Blue Br. at 66; *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998). Again, neither Title VI nor the Age Discrimination Act contain any similar provision.

In short, the Court must consider not only the "statutory language of § 12132, but also "the language and design of *Title II as a whole*." *Frame v. City of Arlington*, 657 F.3d 215, 230–32 (5th Cir. 2011) (en banc) (quoting 42 U.S.C. § 12101(a)(5) and explaining that Congress intended Title II to cover "various forms of discrimination").

### c. Title VI and the "Age Discrimination Act" are Spending Clause statutes; Title II is not.

The statutes interpreted in *Kamps* and *Sandoval* were both Spending Clause statutes premised on the receipt of "Federal financial assistance." 42 U.S.C. §§ 2000d; § 6102. But Title II was enacted under the Commerce power and the Fourteenth Amendment power. 42 U.S.C. § 12101(b)(4). This "Spending Clause" distinction matters a great deal where the "private cause of action" is "implied by the judiciary rather than expressly created by Congress." *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York*, 463 U.S. 582, 597 (1983).

The reasoning undergirding *Sandoval* was that Spending Clause statutes operate akin to a "contract." *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–25 (1981). And a contract must contain "clear notice" of its legal obligations. *Id.* at 25. Thus, Spending Clause legislation must "unambiguously" notify recipients of federal funds what they are signing up for. *Id.* at 17.

But this "notice" problem is not present here, because legislation under the Fourteenth Amendment and Commerce Clause binds public entities "involuntarily." *See id.* at 16. As a result, any ambiguity should be construed in favor of coverage, given the ADA's "broad mandate" and

"sweeping purpose." *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). This is especially important at the motion-to-dismiss stage. *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022) (under Rule 12, "any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor").

**d. This Court declined to apply *Sandoval* to Title II in *Frame*.**

Even assuming Title II has the "same textual structure," this Court declined to apply *Sandoval* to Title II. *Frame*, 657 F.3d at 224–33. Indeed, it rejected an argument nearly identical to Willow's. The Court held that there was a "private cause of action" to enforce the DOJ's sidewalk regulation, because the regulation "simply appl[ied]" the text of Title II. *Id.* at 224, 232–33 (quoting *Sandoval*, 532 U.S. at 285–86).

Willow's only response is that *Frame* involved the DOJ's sidewalk regulation (28 C.F.R. § 35.151(a)), not its disparate-impact regulation (28 C.F.R. § 35.130(b)(8)). Red Br. at 39. But that is a distinction without a difference. Title II governs *all* "barriers" to accessibility, not just "architectural" ones. *See Frame*, 657 F.3d at 230–32 (explaining that Title II is intended to "remove architectural and *other barriers* to accessibility") (emphasis added). Like the sidewalk regulation, the

disparate-impact regulation “simply appl[ies]” the statutory text. *See id.* After all, Willow’s testing policy, like city sidewalks, is facially neutral: O.E. was free to *try* to gain admission to Willow, just as wheelchair users could *try* to use Arlington’s sidewalks.

**e. *Sandoval* is inapposite because the parties *agreed* that Title VI did not prohibit disparate-impact discrimination.**

Even if Title VI has the “same textual structure” as Title II (it does not), *Sandoval* would not mandate the same result, because *Sandoval* did not actually analyze the statutory text of Section 601. Instead, the Supreme Court took as a given, based on prior opinions and concurrences, that Title VI “prohibits only intentional discrimination.” *Sandoval*, 532 U.S. at 280. Because “no party disagree[d]” with that premise, the Court did not examine the statutory text. *Id.*

*Sandoval* features no evaluation of the phrases “excluded from participation in” or “denied the benefits of.” *See* 42 U.S.C. § 2000d. It referenced the text only in passing. Based on this agreed-upon understanding, the Court held that there is no private right of action to enforce Title VI’s *regulations*, because they prohibited conduct that the parties *agreed* Title VI “permits.” *Id.* at 285.

By contrast, O.E. very much "disagree[s]" with the notion that Title II does not prohibit disparate impact. *See id.* And nothing in *Sandoval* is responsive to O.E.'s textual arguments. Blue Br. at 42–45, 63–68. Thus, *Sandoval* has no persuasive value here.

## VI. Residence, not enrollment, triggers the IDEA.

### A. Willow fails to address La. Rev. Stat. § 17:1942.

It is axiomatic that statutes have more force than regulations. But Willow ignores the Louisiana statute that says "residence" triggers the IDEA. La. R.S. § 17:1942(B)(3). Instead, it relies on administrative *regulations*, which it did not brief in the district court.

Statutory text is king. Thus, any regulation that does not premise IDEA obligations on "residence" is owed no deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024) (courts must "always. … *independently* interpret" statutes). This Court must implement the intent of the Louisiana legislature, not an administrative agency.

The LDOE regulation at issue defines an LEA's "jurisdiction" as including students "residing within" the "boundary of the educational facility." 28 La. Admin. Code Pt XLIII, § 230(D)(4). Thus, Willow's asks this Court to follow a regulation that, read literally, extends only to

students who live inside the school building. This regulation is irrational, and courts do not uphold regulations that lead to "absurd … result[s]." *United States v. Female Juv.*, 103 F.3d 14, 16–17 (5th Cir. 1996).

### B. In light of *Herbert*, Willow disavows its "enrollment" theory and repackages it as a "placement" theory, which lacks merit for the same reasons.

After the district court's ruling, this Court ruled that, "under Louisiana law, [a child's] residence"—not "enrollment"— "determine[s] whether the School Board owe[s] [him] a FAPE." *Herbert*, 177 F.4th at 639–40. Willow's only answer to *Herbert* is that it did "not address placement-based jurisdiction for charter-school LEAs." Red Br. at 25. With this, Willow has moved the goal posts. In the district court, it argued that "enrollment," not residence, triggered the IDEA. ROA.446–47. But the student *was* "enrolled" in *Herbert*.

Because *Herbert* disposes of its "enrollment" theory, Willow has disavowed this argument in favor of a "placement" theory. It even faults the district court for using the word "enrollment," lamenting that "[p]erhaps the District Court could have said '*placement*—not residence' triggers IDEA obligations." Red Br. at 22. But it was *Willow* who urged that "enrollment" is the triggering event. ROA.446–47.

Willow's new argument relies on yet another LDOE regulation that it never briefed in the district court. 28 La. Admin. Code Pt XLIII, § 230(D)(5). It argues that when the OPSB "*places* a student in another LEA," the student "remains within the jurisdiction of the placing LEA," and "[t]he responsibility for a FAPE remains with the placing LEA." Red Br. at 20. This argument is meritless.

**1. The OPSB *matches* students with charter schools; it does not "place" them.**

The term "placement" is a term of art under the IDEA. It refers to a child's "educational program—not the particular institution where that program is implemented." *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003)). Thus, a child can be moved from one school to another, or even from one LEA to another, while maintaining the same "placement." *See id.* The OPSB has no role in implementing the "educational programs" of students in charter schools. *Id.*

Indeed, Willow's argument makes no sense on its face, because *all* Willow students (around 2,300 total) must go through the OPSB's matching system. Accepting Willow's argument would mean that the OPSB "remains" the LEA for all disabled students and therefore must draft IEPs, coordinate/attend every IEP meeting, and ensure that every

Willow student receives a FAPE. *See* Red Br. at 20. And the OPSB would be doing all of this out of the goodness of its heart, of course, because Willow—not the OPSB—is the ultimate recipient of government funds to educate Willow's students. La. R.S. § 17:3995(B). The OPSB plainly did not agree to such a one-sided arrangement. ROA.470; ROA.493.

Even under the more common understanding of the word "placement," the OPSB has no authority to "place" any students in charter schools. It is a glorified middleman that provisionally *assigns* students. To avoid the problem of having 50 charter schools with 50 different registration processes, the OPSB created a centralized process (NCAP). The NCAP "match[es]" students, based on family preference and school capacity.[3] But it is up to families to then "<u>complete registration directly with the [charter] school</u>." *Id.* at pg. 21. Thus, the OPSB does not "place" any students at Willow.

---

[3] NOLA Public Schools, *K-12 Family Enrollment Manual*, at pg.15 https://enrollnolaps.com/siteuploads/editorimg/file/K-12%20Family%20Enrollment%20Manual%20SY26-27%20(2).pdf

### 2. Section 230(D)(5) merely implements 20 U.S.C. § 1412 and has nothing to do with charter schools in New Orleans.

Willow's new "placement" argument is just a clever attempt to repackage its "enrollment" argument by shoehorning it into an unrelated regulation. Notably, however, Willow fails to cite the full text of the regulation:

> If an LEA places a student in another LEA ***or an approved private school***, the student so placed remains within the jurisdiction of the placing LEA. The responsibility for a FAPE remains with the placing LEA.

28 La. Admin. Code Pt XLIII, § 230(D)(5) (emphasis added). Willow also omits Part (a), which applies the same rule for students "sent to a board special school." *Id.* at § 230(D)(5)(a). The terms conveniently omitted from Willow's brief make clear that this regulation refers to 20 U.S.C. § 1412 and has nothing to do with charter schools in New Orleans.

Section 1412 provides that if an LEA of residence cannot meet a student's needs and must find another school district or a "private school" for the child, the LEA of residence remains financially and legally responsible for providing a FAPE. 20 U.S.C. § 1412(a)(10). An LEA can "refer[]" a child to a private school, "at no cost" to the parents, as a "means of carrying out" its IDEA obligations. 20 U.S.C. § 1412(a)(10)(B). Or,

parents can unilaterally move their children to private schools and demand "tuition reimbursement" from the LEA. *Id.* at § 1412(a)(10)(C)(ii).

A separate part of Section 1412 governs "interagency" disputes or agreements, requiring each State to establish procedures and assign "responsibility" to particular school districts or other agencies. *Id.* at § 1412(a)(12). This issue most commonly arises when a child is educated in a "neighboring" LEA, because the LEA of residence "lack[s] the means" to provide him a FAPE. *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 861 (3d Cir. 1996) (requiring LEA to pay $25,000 to a "neighboring LEA" to educate a child with Down Syndrome). This provision also applies when a child receives education "in another state." *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 182 (6th Cir. 1996).

Accordingly, the cited LDOE regulation, § 230(D)(5), has nothing to do with "placement-based jurisdiction for charter-school LEAs," whatever that means. Rather, it implements Section 1412(a), which provides that, if one LEA agrees to (or by court order is forced to) move a child from its own LEA into that of another, the LEA of residence "must exercise supervisory authority" and "retains financial responsibility."

*Wise*, 80 F.3d at 182. To be sure, § 230(D)(5) could apply to charter schools in certain instances. If, for example, Willow lacks the resources to meet the needs of a blind child, a hearing officer (or a court) could order that the child be educated in a private school or another New Orleans charter school. But Willow would "remain[]" the child's LEA and thus be financially responsible. *See* § 230(D)(5).

**3. Willow's "placement" theory creates the same "Catch 22" as its enrollment theory.**

Willow's new "placement" theory remains a quintessential Catch-22. Intellectually disabled students can't challenge the use of the admissions test unless they're "placed" at Willow, but they'll never be "placed" there because they can't pass the admissions test. Red Br. at 21. Willow never addresses this problem in its brief.

Willow's theory would create similar problems for open-enrollment schools. Charter schools could "rebuff" a "military family" trying to choose between various charter schools. Blue Br. at 30–31 (quoting *James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000)). The family "would have to enroll their child" in a charter school without any assurances that the school's "IEP would constitute a FAPE."

*See Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1069–70 (D.N.J. 2011).

### C. Willow's "site selection" argument is meritless, because Willow is an LEA with only one "site."

This case does not concern "school-site selection." *See* Red Br. at 23–24. Unlike the Ascension Parish School Board's LEA, Willow has only *one* "site" available to students O.E.'s age. *See White*, 343 F.3d at 377. Every Willow student O.E.'s age is placed at the same school building. Thus, this case does not concern *placement within* an LEA. It concerns wholesale *exclusion from* an LEA.

Moreover, Willow admits that New Orleans is a "district of choice." Red Br. at 5. Thus, students in New Orleans do have a right to dictate "site" selection, so long as there are "seats available" at that school. ROA.21 at ¶ 75. And Willow's contention that "proximity is not an IDEA entitlement" is also wrong, Red Br. at 23, because O.E. is entitled to be educated "as close as possible to [his] home," 28 La. Admin. Code Pt XLIII, § 116(A)(2)(c).

## VII. The Court should preliminarily enjoin Willow.

Willow has **zero** students with intellectual disabilities. Like the district court, it euphemizes this fact as being "<5%." Red Br. at 53.

Characterizing “zero” as “less than five percent” is a bit like saying “the 2017 Cleveland Browns won less than five percent of their games.” Technically true, but highly misleading.

Willow also claims that “thirteen other schools have 5% or <5% and do not use academic-criteria admissions.” Red Br. at 53. Willow does not identify these “thirteen” schools. In any event, this argument is both numerically and legally incorrect.

First, every open-enrollment school has an intellectually disabled population higher than “zero.” We know this, because all these schools report at least some students taking the “LEAP Connect” assessment, which is designed for students with “significant cognitive disabilities.”[4] While Audubon Charter Gentilly reported that “<5%” of its students are intellectually disabled, it also reported that “8%” of its students sat for the 2022–23 LEAP Connect. ROA.1523. Similarly, Alice Harte Elementary reported that 12% of its students took LEAP Connect. ROA.1523. By contrast, *exactly zero* students at Willow sit for LEAP Connect. ROA.1295–96.

---

[4] Louisiana Department of Education, *Students with Significant Cognitive Disabilities* (explaining LEAP Connect), https://doe.louisiana.gov/school-system-leaders/diverse-learners/students-with-significant-cognitive-disabilities

Second, even assuming "other" schools have numbers as egregious as Willow's, this is an "everyone else was doing it" defense, which carries no weight. *See O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004). For the same reasons, Willow's statement that O.E. is not being irreparably harmed because *a different* school is educating him is meritless. "Making disabled persons go somewhere else … is simply no defense to a claim of [educational] discrimination." *See U.S. v. City of Jackson, Mississippi*, 318 F. Supp. 2d 395, 415 (S.D. Miss. 2002). Whether O.E. can receive services somewhere else may "affect his damages," but "it does not allow [Willow] to escape [its] ADA obligations." *Luke v. Texas*, 46 F.4th 301, 306–07 (5th Cir. 2022).

Finally, Willow cites a supposedly "glowing report," which it claims was written "by Southern Poverty Law Center." Red Br. at 54. But this compliance report was written by LDOE and an independent monitor—not by SPLC. ROA.1005, ROA.1536–37. More importantly, Willow conceded at the hearing that this report evaluated *already-enrolled* students and thus "had nothing to do with the Iowa Assessment" or its admissions policy. ROA.1262.

## CONCLUSION

For the foregoing reasons, O.E. prays that this Court reverse the district court.

Respectfully submitted,

September 16, 2026

/s/ *Chris Edmunds*

Chris Edmunds, Counsel for Plaintiff-Appellant
LBSA: 37670
Chris Edmunds Law Office
813 S. Carrollton Ave., New Orleans LA 70118
(504) 314-0034
chrisedmundslaw@gmail.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies as follows:

This brief complies with the type-volume limitation in Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure, because, excluding the parts exempted under Fed. R. App. 32(f) and 5th Cir. R. 32.2, this brief contains 6,500 words.

This brief complies with the typeface requirements of Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure, because it has been prepared in a proportionally spaced typeface in Microsoft Word (version 16.51) in Century Schoolbook. The text is prepared in 14-point font, and the footnotes are prepared in 12-point font.

*/s/___Chris Edmunds____*
Attorney for Plaintiff-Appellant

Date: Sep. 16, 2026